Laramore, Judge,
delivered the opinion of the court:
This suit is brought to recover the amount of $4,439,869.62 of Federal income tax, and $487,582.11 in deficiency interest *229 paid thereon, together with interest on both sums as provided by law, paid by plaintiff for its tax calendar years 1950-1952, 1954-1955, inclusive.
This case can be properly categorized as a study of the toils and tribulations of the railroad industry throughout its undercapitalized expansionary period to its present fight for survival. The presently contested issues involve certain items which the taxpayer claims to have become worthless in 1952 or alternatively in 1954, thus entitling it to a deduction from gross income under section 23 of the Internal Bevenue Code of 1939.[1] The items in question are taxpayer’s secured and unsecured claims against Wisconsin Central Bailway and taxpayer’s common stockholdings in that company. Since the questions we are confronted with involve factual determinations, i.e., did each item become worthless within the asserted taxable year, and since some of the items in dispute had their origin in the early 1900’s, a lengthy discussion of the facts is required.
In 1909, the taxpayer’s predecessor, the Minneapolis, St. Paul & Sault Ste. Marie Bailroad Company, was the owner of railway extending throughout various midwestern states. (Both the taxpayer and its predecessor will be referred to as the “Soo” or taxpayer.) At this time Soo was still engaged in extending its railway facilities. These costs proved a financial drain upon it. Thus, in order to avoid these large *230 expenditures, Soo’s management initiated steps to acquire permanent managerial and operational control over all the assets of Wisconsin Central Bailway (referred to hereinafter as Wisconsin Central). The lines of Soo and the Wisconsin Central were so situated as to facilitate their connection and operation as one continuous line. During the early months of 1909, Soo acquired 81,000 shares out of a majority of the 161,263 shares of the Wisconsin Central’s total outstanding common stock for a total cost of $3,658,337.09. In 1924, Soo acquired 78,088 common shares from the minority shareholders in exchange for its 25-year five and one-half percent Gold Notes and pledged said shares as collateral. As these notes matured serially and were paid off in cash, Soo acquired complete title free of pledge to 22,319 shares at a cost of $965,157.44.[2] During the years 1927-1930, Soo acquired 266 additional shares of Wisconsin Central common stock for $6,046.60 in cash. Soo thus acquired a total of 103,583 shares of Wisconsin Central common stock, having an original cost basis of $4,629,541.13.
Soo, in 1909, also acquired the right to vote a majority of Wisconsin Central’s 112,659 outstanding shares of preferred stock by issuing its own four percent leased line stock certificates to those exchanging Wisconsin Central preferred stock therefor. By December 1932, all except 95 shares of Wisconsin Central preferred stock had been exchanged.
Soo’s purpose in acquiring and retaining its holdings of Wisconsin Central common and preferred stock was to effectuate and perpetuate operational control over Wisconsin Central’s assets. The method ultimately chosen, following the pattern for railroad amalgamations, was that of a long-term lease between Soo, as lessee, and Wisconsin Central, as lessor. Under the lease, Soo acquired both possession of and control over the assets of Wisconsin Central for a period of 99 years beginning on April 1,1909. The lease did not provide for a fixed rental. However, it contained a provision that at the termination of the lease, Soo agreed that it would “surrender *231 to the lessor * * * [the leased properties] free from floating indebtedness incurred for maintenance or operating expenses * *
From April 15,1909 forward, Soo operated its own properties, together with those of Wisconsin Central, as a single integrated system with income and expenditures being pooled. At the end of each calendar month, a balance was struck and net income distributed. When Wisconsin Central’s gross income was insufficient to cover its necessary monthly expenditures, funds of Soo were temporarily advanced, such advances normally being repaid from the earnings and funds of Wisconsin Central during the immediately succeeding months. When Wisconsin Central’s running monthly balances fell in arrears for an extended term, it became the practice of Soo to reimburse itself for the advances thus made to Wisconsin Central from the proceeds of bond issues floated by Wisconsin Central. By March 31, 1912, the Wisconsin Central’s monthly balances reflected net sums due Soo amounting to $1,246,000. These monthly borrowings were repaid in April of 1912 from the net proceeds of a public issue of Wisconsin Central’s four percent first and refunding mortgage bonds. Soo guaranteed the payment of interest on these bonds when they were sold to the public.
Between April 1912 and February 1921, Wisconsin Central was able from operating income to pay for all of its own expenses and charges. After February 28, 1921, however, Wisconsin Central’s earnings having again declined, the adverse credit balances in the monthly running account reflected net sums due Soo. By May of 1924, Wisconsin Central was indebted to Soo in the amount of $4,126,110.66. This entire sum was repaid to Soo by Wisconsin Central in June of 1924, partially from the proceeds of Soo’s sale to Dillon, Read & Co. of 3-year five and one-half percent secured Gold Notes in the amount of $3 million issued to and acquired by Soo from Wisconsin Central and guaranteed by Soo. This issue of indebtedness by Wisconsin Central and S'oo was approved by the Interstate Commerce Commission (hereinafter referred to as the ICC or Commission) as required by law.
*232 Although the balance of the running account between the Wisconsin Central varied from month to month after November 30, 1925, the balance never was in Wisconsin Central’s favor. On December 2,1932, a bill of complaint was filed by a bondholder of Wisconsin Central in the District Court, alleging Wisconsin Central’s inability to pay interest on its bonds and praying for an appointment of a receiver. Accordingly, on the same day, the District Court appointed a receiver who took immediate possession of Wiconsin Central’s properties.
As of the end of December 1932, the adverse balance in. the running monthly account with Soo totaled $7,685,142.78. This total was comprised of $804,942, representing five percent interest charged on Wisconsin Central’s adverse monthly balances since November 30, 1925, pursuant to a resolution of the Board of Directors of both corporations; $1,375,000 of interest on Wisconsin Central’s five percent refunding bonds accrued during 1930-1932,[3] inclusive; and $5,505,200.78, representing monthly sums advanced by Soo over the term December 1,1925 to December 31, 1932. The delayed receipt of sums earned by Wisconsin Central prior to December 2, 1932, but thereafter reduced to possession, continued until 1948, amounting in all to $135,609.18 and, upon receipt, these sums were applied by Soo in reduction of Wisconsin Central’s adverse monthly balances. A further reduction of $500,000 was effected as of February 28, 1939, when the receivership court determined that cash in that amount advanced to Soo by Wisconsin Central in October of 1917 represented Wisconsin Central’s share of materials and supplies for the system. Thus, the net balance in favor of Soo as of the onset of Wisconsin Central’s receivership on December 2, 1932 was ultimately ascertained to be $7,049,533.60. The same day the receiver took over, Soo entered into a new operating agreement with the receiver (and subsequently, when Wisconsin Central went into bankruptcy proceedings, with the trustee) and continued to operate the properties of Wisconsin Central under the new *233 agreement. The operating revenues of Wisconsin Central, subsequent to being placed in receivership, proved sufficient to provide for its part of the cost and expenses under the new operating agreement.
After being placed in receivership, Wisconsin Central defaulted in the payment of the April 1,1933 interest installment due on $5,816,000 maturity value 'of its 1912 four percent refunding bonds. (Soo in 1912 had guaranteed the payment of interest on these bonds.) Soo thereupon, pursuant to its express guarantee, paid the interest coupons maturing on this 1912 issue between April 1,1933 and October 1,1937, at a total cost of $1,142,260. No further interest payments after October 1, 1937 were made by Soo. On December 31, 1937, Soo filed a voluntary petition for reorganization under section 77 of the Bankruptcy Act.
On October 14, 1938, Soo filed its proof of claim against Wisconsin Central, claiming the amount of the recorded balances adverse to Wisconsin Central.[4] Wisconsin Central’s receiver filed objections to Soo’s unsecured claims in their entirety, but no hearings thereon were ever held in the receivership proceeding because the court was of the opinion that up to that time the question appeared to be moot and, therefore, unnecessary to be litigated.
On March 17,1942, the ICC approved a plan of reorganization for Soo. As part of its report on the plan for reorganization of Soo, the Commission was required to value the assets of Soo. In connection with such valuation, in its report the Commission found:
The record shows that there are certain unpledged assets of the debtor, concerning which there is doubt as to whether they are subject to the liens of the debtor’s mortgages. Included among these is a claim by the debtor against the Wisconsin Central, which is in receivership, for interest paid by the debtor as guarantor on the latter company’s bonds, which is carried on the debtor’s balance sheet at $10; $7,104,081 of open-account advances to the Wisconsin Central against which a counterclaim for approximately $16,000,000 against the *234 debtor has been filed by the receiver of the Wisconsin Central; 103,585 shares of Wisconsin Central common stock, carried on the debtor’s balance sheet at cost, $4,629,541, but of doubtful value, if any, since the Wisconsin Central is in receivership; * * *.
The examiner found that the value of the above-enumerated items is “highly speculative.” * * *
Wisconsin Central’s equity receivership was superseded as of September 30,1944, by a trusteeship which resulted in the debtor’s reorganization under section 77 of the Bankruptcy Act, on March 1, 1954. Extended litigation between Wisconsin Central’s numerous classes of creditors added materially to the time required to effect Wisconsin Central’s reorganization.
On March 1,1945, Soo filed its secured claim against Wisconsin Central then in trusteeship.[5] It also renewed its unsecured claim for the amount of the recorded running balances adverse to Wisconsin Central. Soo’s secured claim was for the payment by Soo, as guarantor, of interest in the amount of $1,142,280[6] on Wisconsin Central’s 1912 four percent refunding bonds. Soo claimed that it was entitled to a lien against the mortgaged properties next subordinate to the lien of the holders of the bonds. Subsequently, Soo conceded that its secured claim was subordinate to the claims of holders of the refunding bonds (both four and five percent issues) for principal and interest. Finally on August 21, 1952, it was judicially determined by the TJ.S. District Court, sitting as a bankruptcy court in Wisconsin Central’s reorganization, that Soo’s claim for payment of interest coupons was a secured claim.
On April 13,1945, Wisconsin Central’s trustees filed their objections to Soo’s claims. Contemporaneously, claims against Wisconsin Central were filed by the debtor’s other *235 creditors, both secured and unsecured. Wisconsin Central’s trustees recommended to the District Court that no action be taken on Soo’s claim unless and until it should first be determined that there were sufficient assets of the debtor available for general creditors or that the value of Wisconsin Central’s assets were sufficient to permit Soo to participate in the reorganization plan. The District Court signed an order setting for hearing the claims of the other secured creditors but fixed no hearing on any claim of Soo. These claims of the other secured creditors were not finally resolved until 1950.
By 1945, hearings before the ICC had already commenced on a proposed plan of reorganization for Wisconsin Central. An. IOC examiner’s proposed report on Wisconsin Central’s reorganization recommended that all claims against Wisconsin Central having preference over general claims (but not over bonds), all general claims and all preferred and common stocks be found to have no value. This prompted Soo, on August 26, 1946, to submit a memorandum to the Commissioner of Internal Revenue relating to the deducti-bility of losses sustained by it on certain claims against Wisconsin Central. The memorandum referred to Soo’s holdings of Wisconsin Central’s common stock, its claim against Wisconsin Central for the running balances, and the secured claim for the guaranty of interest. However, in its income tax return for the calendar year 1946, Soo claimed bad debt losses only on account of interest in the sum of $1,142,280 it had paid as guarantor on Wisconsin Central’s first and refunding four percent bonds. By a letter dated April 4, 1947, the Commissioner of Internal Revenue ruled that Soo was not entitled to deduction for worthlessness of either the claim for advances or the claim for the interest paid on the Wisconsin Central’s bonds from 1933 to 1937.
On June 3, 1947, the ICC issued its report and order approving a plan of reorganization of Wisconsin Central. The report stated, in part:
Our analysis of the record discloses no free assets. Inasmuch as the total amount of new securities issuable under the plan is insufficient to satisfy the claims of *236 secured creditors, we find that there is no value attaching to any claims not entitled to priority over the mortgages. Thus, we find that the claims of unsecured creditors, and the debtor’s preferred and common stock have no value and the holders thereof may not participate in the reorganization.
The plan of reorganization allocated neither cash nor securities to Soo’s claim for interest on the four percent bonds paid and held by Soo, its unsecured claim, and its stock. Soo did not file a petition for reconsideration, rehearing, or modification of the ICC order of June 3, 1947. The ICC report valued Wisconsin Central’s assets, as of December 1, 1943, at a total of $60,959,000. Against these assets, the ICC reported that as of June 30, 1945, liabilities of the receiver and of Wisconsin Central secured by mortgage were a total of $65,836,892.
Due to a marked improvement in Wisconsin Central’s economic position, the ICC ordered a reopening of the proceedings on Wisconsin Central’s reorganization. The ICC observed that under the reorganization plan which it had approved in 1947, the value for the reorganized company warranted a capitalization of only $46,840,600. However, the forecast of normal year earnings upon which the 1947 reorganization plan had been based, had been completed in 1942 and had been predicated on Wisconsin Central’s earning experience from 1923 to 1941. The ICC determined that Wisconsin Central’s assets as of the end of 1946 totaled $65,826,000, in lieu of the $60,959,000 determined in the 1947 report based upon 1943 data. The ICC concluded that the value of Wisconsin Central’s assets could support a new capitalization of $59,000,000 rather than the $46,800,000 it had previously approved in 1947. Thus, the ICC authorized a total of 208,000 new common shares in the reorganized Wisconsin Central and allocated 173,930 to secured creditors and Soo’s interest claim. Some 34,070 shares were allocated to three unsecured claims; among them was Soo’s unsecured claim for advances.
Early in March of 1952, after having resolved the claims of the other secured creditors of Wisconsin Central, the District Court turned to Soo’s claims against Wisconsin Cen *237 tral. A 3-day hearing was held. Thereafter, on May 12, 1952, all of the parties in interest, except Wisconsin Central itself and a committee of its preferred stockholders, executed a “Stipulation and Agreement” which fixed an upper limit upon the extent of any possible recovery by Soo upon its claims against Wisconsin Central. The agreement was approved by the District Court and the opposition’s appeal therefrom was dismissed by the Court of Appeals.
Under the agreement the parties, among other things, all bound themselves to support the then pending ICC proposed plan for Wisconsin Central’s reorganization. The parties further agreed that the claim of the Soo, based on its payment of interest on Wisconsin Central’s four percent 1912 bonds, was to be allowed as a secured claim in the amount of $1,142,260, without interest thereon. As to Soo’s claim for advances to Wisconsin Central, the parties agreed that it should be allowed in the principal amount of $750,000, without interest, as an unsecured claim. Both claims were to be satisfied in accordance with the priority provisions of the proposed reorganization plan. The plan accorded no recognition to the holders of Wisconsin Central’s preferred and common stock. In approving the agreement between the parties, the District Court noted the possibility that the preferred stockholders and Wisconsin Central, who had not participated in the agreement, since the ICC found no equity available for them, might have the order of approval of the plan of reorganization vacated. The court determined that Soo’s claim for payment of interest was a secured claim, without interest.
Under the reorganization plan of Wisconsin Central as finally consummated March 1, 1954, Soo’s recovery on account of its $1,142,260 secured claim was limited to a maximum of 14,849.38 shares of the Wisconsin Central’s new common stock, and to a maximum of 9,000 shares of such new common stock on account of its unsecured claims to the extent of the $750,000 thereof accorded recognition, or a maximum total in all of 23,849.38 shares. This maximum sum, however, was at all times expressly made subject to reduction depending on the outcome of a claim against Soo *238 by other creditors. The fair market value of the shares of Wisconsin. Central’s new common stock was $40 per share. Thus, as of 1952, the value of the maximum of 14,849.38 common shares issuable for the Soo’s $1,142,260 claim for interest it made as guarantor was $594,000, and the value of the maximum of 9,000 shares attributable to the $6 to $7 million claim for advances and interest thereon, stipulated to be recognized to the extent of $750,000, was $360,000. The total maximum value was, therefore, $954,000 for the 23,849.38 shares. However, the bond holder who claimed the right to be subrogated to Soo’s recovery received 5,800 of the escrowed shares in a 1960 settlement among the parties. Thus, Soo actually received 18,500 shares which, at the 1952 value of $40 per share, totaled $722,000. Of this amount, $362,000 was attributable to its secured claim.
As noted above, Wisconsin Central’s plan for reorganization, which was duly consummated March 1, 1954, accorded no recognition to the holders of Wisconsin Central’s old preferred and common stock, and these stockholders in fact received nothing whatsoever for their holdings.
In each of its tax calendar years 1950-1955, inclusive, Soo retired from service certain of its roadway property subject to depreciation under the retirement method of accounting. Upon the audit of Soo’s tax returns for those years, the Commissioner of Internal Revenue disallowed a portion of Soo’s tax basis of this retired roadway property equal to the depreciation such property had undergone prior to March 1, 1913, totaling $47,382.66.
For the year 1953, Soo paid into the Treasury of the United States nothing in income taxes by reason of having realized a net operating loss for that year in the amount of $680,982.43, none of which amount has ever been allowed to Soo either as a carry-back or as a carry-over.
Within the time provided by law, Soo filed formal refund claims for the years 1950, 1951, 1952, 1954 and 1955. The Commissioner formally disallowed all of these claims by statutory notice dated June 27, 1958. Soo’s refmid claims consisted of: (1) extra depreciation deductions for the years 1950-1955, inclusive, on the retirement of roadway property *239 subject to depreciation under the retirement method of accounting on the ground that no adjustment of its deductions was proper on account of pre-1913 depreciation; (2) a deduction in 1952, and alternatively in 1954, on account of its advances made to Wisconsin Central prior to December 3, 1932, having first become wholly worthless in 1952 or 1954; (3) a deduction in 1952, and alternatively in 1954, on account of its secured claims against Wisconsin Central represented by bond interest coupons having first become wholly or partially worthless in 1952 or 1954; (4) an ordinary deduction and alternatively a capital loss deduction in 1952, and alternatively in 1954, on account of its holdings of Wisconsin Central’s old common stock having first become wholly worthless in 1952 or 1954; (5) appropriate carry-backs or carry-overs of net operating losses and capital loss carryovers depending on which year or years its advances, secured claims, and stock investments became wholly worthless.
As noted above, the Commissioner formally disallowed these claims for refund and taxpayer has timely brought suit thereon. The claims for extra depreciation (claim (1), supra,), and for a proper carry-back and carry-over for losses sustained by Soo in 1953, have been conceded by the defendant. We are met here with the problem of whether Soo’s claims, both secured and unsecured, against Wisconsin Central and its common stock investment in that company became worthless in 1952 or alternatively in 1954, thereby allowing Soo to take a deduction from gross income under section 23 of the Internal Revenue Code of 1939.
The test of worthlessness prior to the 1942 amendments[7] was deemed to be a subjective rather than objective one, and the taxpayer could properly claim the deduction in the year in which there was a bona fide ascertainment by the taxpayer of the worthlessness of a debt irrespective of *240 whether its worthlessness could have been ascertained prior to the year when it was discovered, so long as taxpayer exercised reasonable judgment. E.g., Herskovits v. Commissioner, 110 F. 2d 272 (2d Cir. 1940); Moore v. Commissioner, 101 F. 2d 704 (2d Cir. 1939). But see Curry v. Commissioner, 117 F. 2d 307 (2d Cir. 1941). This subjective test was rejected by the Supreme Court in Boehm v. Commissioner, 326 U.S. 287, 292 (1945). The Court reasoned that the language of the statute (after the 1942 amendments) and the regulations promulgated under it require that the loss to be deductible “must have been sustained in fact during the taxable year.” (Emphasis by the Court.) We interpret this as meaning that the taxpayer now not only has the burden of proving that the debt had some intrinsic value at the beginning of the year it allegedly became worthless and that it became worthless in the taxable year in question, but also that the taxpayer must show that throughout the entire life of the debt, the evidence reasonably available to him pointed out that it was possessed of some value and had not become wholly worthless. Cf., Redman v. Commissioner, 155 F. 2d 319 (1st Cir. 1946); Wathins v. Glenn, 88 F. Supp. 70 (W.D. Ky. 1950).
It is obvious that there is no precise test for determining worthlessness within the taxable year and neither the statutory enactment, its regulations, nor the decisions attempt such an all-inclusive definition^ From the numerous decisions, we are taught that a determination of whether or not a debt becomes worthless in a particular year must be confined to the fact of the particular case. Furthermore, it is often impossible to select a single factor or “identifiable event” which clearly establishes the time at which a debt becomes worthless and thus deductible. More often it is a series of events which in the aggregate present a picture establishing that the debt in question has become worthless. Such a decision of necessity requires a practical approach, not a legal test. Boehm v. Commissioner, supra. It must be flexible in nature, varying according to the circumstances of each particular case, so that whatever inferences a court plight draw from a particular fact in another case are not *241 binding on the examining court, although the same fact may be present. The Tax Court has aptly said that “worthlessness is not determined by an inflexible formula or slide rule calculation, but upon the exercise of sound business judgment.” Washington Institute of Technology, Inc., 10 T.C.M. 17, 20 (1951). In making such a determination the taxpayer must follow a rule of reason, avoiding alike the Scyllian role of the “incorrigible optimist” and the Chary-bdian character of the “stygian pessimist.” United, States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 403 (1927); Ruppert v. United States, 86 Ct. Cl. 396, 403, 22 F. Supp. 428,431, cert. denied 305 U.S. 630 (1938). To be deductible, a debt need not be proven worthless beyond all peradventure, since a bare hope that something might be recovered in the future constitutes no sound reason for postponing the time for taking a deduction. Montgomery v. United States, 87 Ct. Cl. 218, 228 (1938), 23 F. Supp. 130, 135, cert. denied 307 U.S. 632 (1939) ; Curry v. Commissioner, supra. The taxpayer is not required to postpone his entitlement to a deduction in the expectancy of uncertain future events nor is he called to wait until some turn of the wheel of fortune may bring the debtor into affluence.
It appears that the taxpayer must strike a middle course between optimism and pessimism and determine debts to be worthless in the exercise of sound business judgment based upon as complete information as is reasonably obtainable. Once it appears from all the surrounding circumstances that a debt has become worthless, we cannot look to subsequent events to determine if a debt in fact became worthless. The possibility of collection is tested by the facts known at that time and not by hindsight. However, subsequent events may be used to evaluate the soundness of our determination that a debt became worthless in a certain year. See 5 Mertens, Law of Federal Income Taxation, section 30.37 (Rev. Ed.). Thus our inquiry must be focused on each year in which the debts were in existence without the benefit of subsequent events to help us arrive at our determination.
With this in mind, we now turn to the specific items alleged by the taxpayer to have become worthless in 1952, thus *242 entitling it to a deduction from gross income under section 23 of the Internal Revenue Code of 1939. We shall consider each of the disputed items separately.
A. Soo's secured claim against ~Wisconsvn Central
As we have stated above, the taxpayer, in determining the point at which a debt became worthless, must exercise sound business judgment based upon as complete information as is reasonably obtainable. Once it appears from all the surrounding circumstances that a debt has become in fact worthless, the taxpayer cannot postpone his entitlement to the deduction. We believe that in the instant situation Soo could not have established from the surrounding circumstances that its secured claim had in fact become worthless. Nor do we believe that Soo’s secured claim did in fact become worthless prior to 1952. The secured claim had some value at the beginning of the year (1952) it allegedly became worthless. It is also clear that the execution of the settlement agreement in 1952 effectively rendered the debt wholly worthless. The area of conflict with respect to this item is centered around the question of whether the debt had become wholly worthless prior to 1952 and thus deductible at that time.
The Government points out that in the original plan for reorganization of the Wisconsin Central, the ICC allocated no securities to this claim. Thus, the Government argues that the secured claims had in fact become worthless. Con-cededly, we can infer from this that Soo’s secured claim had become worthless. However, we cannot blind ourselves to the remaining facts and not look into what served as a basis for the ICC’s report. The Commission, in its subsequent plan, which superseded the 1947 plan for Wisconsin Central’s reorganization, reported that the asset valuation had been completed in 1943 based on pre-1942 data showing total assets of $60,9/59,768. Against these assets the ICC reported liabilities of the receiver and of Wisconsin Central secured by mortgage in the amount of $65,836,892. However, this determination was made late in 1945. A more realistic comparison would be if the 1946 asset valuation of $65,826,000 *243 were used. From this we cannot say whether the debt in fact had become worthless.
The Government argues that we can infer worthlessness of the secured claim from the fact that in its 1946 income tax return Soo claimed a bad debt deduction on account of its secured claim having then become worthless. Soo on the other hand contends that the ICC examiner’s original report, supra, prompted it to take such a course of action. The Government also points out that Soo valued this claim on its books and balance sheet at a nominal $1 value and that Soo did not interpose any objection to the original IOG plan for reorganization which failed to allocate securities to its secured claim. These contentions are based on taxpayer’s attitude and conduct as to what it thought was the status of the debt and are not determinative of the issue whether or not the secured debt had in fact become worthless. We believe that some weight should be given to taxpayer’s actions in our evaluation, but “a determination of whether a loss was in fact sustained in a particular year cannot be made by confining the trier of facts to an examination of the taxpayer’s beliefs and actions.” Boehm v. Commissioner, supra, at 292. What is of primary importance, however, is whether taxpayer, in the exercise of sound business judgment based upon as complete information as was reasonably obtainable, could have determined that the debt in fact had become worthless.
The facts available to the taxpayer in the instant situation at best pointed both ways. We believe that under these circumstances Soo could not, in the exercise of sound business judgment, have determined that the debt had become wholly worthless prior to 1952. The secured claim had a substantial value at the beginning of 1952, and in this respect we note that Soo ultimately received $362,000 worth of new common stock of Wisconsin Central on a secured claim of $1,142,260.[8] The execution of the settlement agreement and subsequent approval by the District Court eflec- *244 tively rendered wholly worthless the debt, except for the specified recovery allowable under the agreement. Moreover, the taxpayer could not have determined that the debt in question had become in fact totally worthless prior to 1952. We say this because Soo’s priority participation as a secured creditor was not determined until 1952. Not until 1945 were the claims of the other secured creditors of Wisconsin Central filed. These claims were not finally resolved until 1950. Consequently, throughout the existence of its secured claim, Soo could have reasonably looked to Wisconsin Central’s assets for at least partial satisfaction of its secured claim. This is not a situation where the taxpayer is postponing his entitlement to a deduction in the expectancy that some turn of the wheel of fortune may bring the debtor into affluence. Throughout this period, taxpayer could have reasonably looked to the debtor’s assets for satisfaction. The fact that at one point the assets appeared to be less than the claimed secured debts is not controlling, since neither the total amount nor the priority of participation of the other secured creditors was finally determined until 1950. A determination that the debt had become totally worthless prior to 1952, in view of the conflicting evidence available, runs contrary to the fact that there was ultimately a substantial recovery on the debt in question. Consequently, we hold that Soo is entitled to take a deduction from gross income in 1952 as provided by section 23 (k) of 'the Internal Revenue Code of 1939, for the loss it suffered on account of its secured claim against Wisconsin Central becoming totally worthless, except for the specified amount recovered under the settlement agreement.
B. Advances by Soo to Wisconsin Central
In considering when debts are deductible, the first problem is to determine whether the taxpayer is owed a debt since it is obvious that a taxpayer cannot take a deduction for a worthless debt unless there is a valid debt arising out of an actual debtor-creditor relationship. The defendant strongly urges that the debtor-creditor relationship which might have existed between Wisconsin Central and Soo on account of *245 the monthly running balances, ceased to exist when the lease was terminated. The defendant supports this assertion by making references to the lease agreement between the parties which required Soo to turn over the leased properties at the termination of the lease free from floating indebtedness. There is no dispute that the lease was terminated when the Wisconsin Central went into receivership in 1932. Thus, the defendant contends, whatever sums might have been owing Soo from Wisconsin Central, incurred on account of their joint operation of the leased properties, were wiped out by the provision of the lease. The taxpayer counters by calling our attention to a resolution of the Board of Directors of Wisconsin Central stating in effect that Wisconsin Central acknowledged that the sums paid by Soo from revenues belonging to it in discharge of current liabilities of Wisconsin Central were to be treated as temporary loans and to be repaid from whatever sources. In the alternative the taxpayer contends that if the sum advanced are not treated as debts and thus deductible under section 23 (k) of the 1939 Code, Soo is entitled to a loss deduction under section 23(f) of the 1939 Code.
We need not decide this issue since we are of the opinion that even if there was a valid debtor-creditor relationship and the debt survived the termination of the lease, the debt became totally worthless prior to 1952. It is apparent that Soo assumed the Scyllian role of the “incorrigible optimist” with respect to such advances. Here it was the burden of the taxpayer to establish the fact that there was a deductible loss in 1952. It was incumbent upon it to establish not only that the debt had some value in 1952, but also that it had not become worthless prior to that time. Furthermore, the taxpayer had to show that it had become wholly or partially worthless in 1952. The taxpayer contends that this unsecured claim was possessed of substantial value at the beginning of 1952, pointing out the fact that there was a recovery of over $300,000 on a $7 million claim. The taxpayer then argues that the execution in 1952 of the settlement agreement, and its subsequent approval by the District Court, effectively rendered wholly worthless the debt in question, except for the specified recovery allowable under the agreement. How *246 ever, we are unable to say that the taxpayer has offered any evidence to support its burden of proof that the debt in question always had some value throughout its existence. The taxpayer asserts that from 1982 to 1948, there were substantial recoveries on the open running account, i.e., some $685,000, thus arguing for the continued value of the debt. We are aware that where there are substantial recoveries on an outstanding debt, we are able to draw the inference that the debt in question has not become totally worthless during that period, due to the debtor’s ability to repay part of the debt. However, we are unable to draw such an inference in the case at bar. The stipulated facts show that of this sum, $500,000 was due to a determination in 1939 by the receivership court that Wisconsin Central was entitled to return of this amount for materials and supplies advanced to Soo in 1917. The reduction of the alleged outstanding debt was accomplished by a mere bookkeeping entry. Under these circumstances, the resulting reduction of the outstanding debt does not indicate the debtor’s ability to repay the debt. We reach the same result with reductions resulting from the delayed receipt of sums earned by Wisconsin Central prior to 1932.
Soo had to look for the satisfaction of its unsecured claim to Wisconsin Central’s assets which would be left over after the secured creditors’ claims had been satisfied, since it is clear that Wisconsin Central could not meet its obligations from its own revenues. Thus, at that time, it was incumbent upon Soo to make a determination based upon as complete information as was reasonably available, as to the possibility of recovery on the outstanding debt. The evidence shows that throughout Wisconsin Central’s receivership and part of its trusteeship, the total value of the assets was not sufficient to satisfy the claims of all the secured creditors. The general creditors were never allocated any securities under the first ICC reorganization plan. The Commission expressly stated that the recapitalization was due to the improved financial position of Wisconsin Central. The mere fact that there were assets at a later date, due to the debtor’s improved financial condition, does not change the result, since the possibility *247 of collection is tested by the facts known at that time and not by hindsight. Soo was not required to postpone its entitlement to a deduction in the expectancy that some turn of the wheel of fortune might bring the Wisconsin Central into affluence, an unlikely event at that time in view of its long history of losses. Thus, the fact of worthlessness could have been reasonably established from all the available information, and it is clear that this event occurred prior to 1952. It follows that the claimed deduction is not available in the years asserted.
C. Soo's holdings of Wisconsin Central common stock
Since we have held that Soo’s unsecured claims became totally worthless prior to 1952, it follows, a fortiori, that Soo’s holdings of Wisconsin Central common stock became also totally worthless prior to 1952. If no value can be attached to claims of unsecured creditors who have priority over the shareholders of a corporation, then of necessity such stock has also become valueless prior to the date in which the deduction is claimed.
EINDINGS OF EAOT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
INTRODUCTION
The entire factual record in this case consists of a Stipulation of Facts filed with the court on October 13, 1960, together with some 39 separate exhibits thereto annexed, plus a Supplementary Stipulation of Facts filed with the court on November 8, 1960, together with 10 additional exhibits thereto annexed. Four additional exhibits offered by defendant were admitted into evidence, subject to plaintiff’s continuing objection, as to two of these exhibits, by the commissioner on December 8, 1961, the record having been reopened to receive additional evidence by order of the *248 court dated December 8, 1961, pursuant to defendant’s request dated November 29, 1961.[9]
FINDINGS OE FACT
1. Plaintiff, Minneapolis, St. Paul & Sault Ste. Marie Railroad Company, is a railroad corporation organized on July 18, 1944, to effectuate a court-approved plan of reorganization, and subsequently existing under the laws of the State of Minnesota. Plaintiff’s principal offices are located in Minneapolis, Minnesota, and since 1944, plaintiff has been continuously engaged in operating as a common carrier by rail of freight and passengers in interstate and foreign commerce subject to the jurisdiction of the Interstate Commerce Commission (hereinafter referred to as “I.C.C.”).
2. Plaintiff’s predecessor, Minneapolis, St. Paul & Sault Ste. Marie Railway Company (hereinafter sometimes referred to as “predecessor”), was a railroad corporation organized on June 11, 1888, under, and subsequently existing pursuant to, the laws of the States of Wisconsin, Michigan, Minnesota, and the Territory of Dakota. Predecessor was a common carrier by rail of freight and passengers in interstate and foreign commerce subject to the jurisdiction of the I.C.C. On December 31,1937, predecessor filed a voluntary petition with the United States District Court for the District of Minnesota, Fourth Division (hereinafter referred to as the “District Court”), seeking reorganization under Section 77 of the Bankruptcy Act, as amended. The District Court thereupon assumed custody of predecessor’s *249 assets and operated them through the agency of a trusteeship. Until reorganized in 1944, predecessor in trusteeship (hereinafter sometimes referred to as “bankrupt predecessor”) was operated by Trustee or Trustees under the jurisdiction of the I.C.C. and the direction of the District Court as a common carrier by rail of freight and passengers in interstate and foreign commerce.
3. Effective at 12:01 a.m., central standard time, September 1,1944, plaintiff, pursuant to order of the District Court, acquired all of the assets of bankrupt predecessor “of every kind and description, whether real, personal, or mixed, whether tangible or intangible, and whether of present or future interests, and all rights, privileges, and franchises of the Debtor.” Both plaintiff and bankrupt predecessor at the time of the September 1, 1944, reorganization were railroad corporations as defined in Section 77 (m) of the Bankruptcy Act, as amended, and the transfer of bankrupt predecessor’s assets to plaintiff was made pursuant to an order of the District Court having jurisdiction in a proceeding under Section 77 of the Bankruptcy Act, as amended.
4. Wisconsin Central Kailway Company (hereinafter sometimes referred to as “old W.C.”) was a railroad corporation organized in 1899 under, and subsequently existing pursuant to, the laws of the State of Wisconsin. Old W.C. after its organization acquired, through receivership proceedings, the properties of a number of small railroads which old W.C. operated prior to April 1,1909.
5. On December 2,1932, a bill of complaint was filed by a bondholder of old W.C. in the District Court, alleging old W.C.’s inability to pay interest on its bonds and praying for the appointment of a receiver of old W.C.’s properties. Old W.C. and predecessor joined in the bondholder’s prayer and the District Court accordingly on the same day appointed a receiver who took immediate possession of old W.C.’s properties. Old W.C. during the course of its receivership is sometimes hereinafter referred to as “old insolvent W.C.”
6. Old insolvent W.C.’s receivership was superseded on September 30, 1944, by a trusteeship under Section 77 of *250 the Bankruptcy Act, as amended. Old W.C. during the course of its trusteeship is sometimes hereinafter referred to as “old bankrupt W.C.” The Section 77 reorganization of old bankrupt W.C. took place under a plan certified by the I.C.C. to the District Court on September 26,1952, and consummated March 1, 1954, pursuant to an order of the Distinct Court.
.7. Wisconsin Central Eailroad Company (hereinafter sometimes referred to as “W.C.”) is a railroad corporation organized on February 19, 1954, under the laws of the State of Minnesota to effectuate a plan of reorganization. From March 1, 1954, forward, W.C. has continued to own the railroad properties so acquired on March 1, 1954, from old bankrupt W.C.
8. On March 1, 1954, old bankrupt W.C. and W.C. were railroad corporations as defined in Section 77 (m) of the Bankruptcy Act, as amended. The transfer of old W.C.’s assets to W.C. was made pursuant to an order of the District Court having jurisdiction in a proceeding under Section 77 of the Bankruptcy Act, as amended, to effectuate the court’s approved plan of reorganization.
9. Plaintiff, predecessor, bankrupt predecessor, old W.C., old insolvent W.C., old bankrupt W.C., and W.C. have at all times since the Eevenue Act of 1913 kept their respective corporate books of account in accordance with the classification of accounts prescribed by the I.C.C.; have filed their respective Federal income and escess profits tax returns in accordance with the methods of accounting employed in keeping their respective books; and at all authorized times have employed the accrual method of accounting and the calendar year basis for the keeping of their respective accounts and the filing of their respective Federal income and excess profits tax returns.
10. Plaintiff, predecessor, and bankrupt predecessor will, in the interests of clarity, be hereinafter referred to indiscriminately as “Soo.” Old W.C., old insolvent W.C., old bankrupt W.C., and W.C. will, in the interests of clarity, be hereinafter referred to indiscriminately as “Wisconsin Central.”
*251 11. In 1909, Soo was the owner of a railway extending from the Twin Cities of Minneapolis and St. Paul eastward to Sault Ste. Marie, Michigan, westward to the Missouri Si ver, and northwest and north across North Dakota and Minnesota to the Canadian border interconnecting at various points with the Canadian Pacific Sailway. Soo also owned an almost completed branch from its main line west of Minneapolis extending from Brooten, Minnesota, northeast across that State to the cities of Superior and Duluth, together with other branch lines in North Dakota, Wisconsin, and Michigan. Wisconsin Central at this same time was the owner of a railway extending from the cities of Ashland, Superior, Duluth, Minneapolis, and St. Paul in a generally southerly direction to Milwaukee and Chicago, together with branch lines in the States of Wisconsin, Minnesota, and Michigan. The then existing lines of Soo and Wisconsin Central were so situated as to facilitate their connection and operation as one continuous main line.
12. In 1909, Soo was still engaged in constructing its lines of track, building bridges and tunnels, and in erecting or improving terminal buildings, passenger stations, warehouses, and other terminal tracks and facilities. These costs proved a financial drain upon Soo which, accordingly, cast about for ways of avoiding duplicating those terminal costs and facilities already undertaken by competitor roads. At this same time, Wisconsin Central was engaged in the construction and extension of its line into Superior and Duluth, having already acquired terminals in both cities. In addition, Wisconsin Central upon completion of its track building program would by the fall of 1909 have had the shortest route between Chicago and Duluth as well as entrances to both Chicago and Milwaukee which Soo lacked. To avoid duplicating terminal acquisition and operation costs, to effect economies of operation and to improve its competitive position through the use of more direct rail routes; to secure an entrance into the gateway rail centers of Chicago and Milwaukee; and to secure an entry into the rich agricultural areas of Wisconsin, Soo’s management in 1908 initiated steps to acquire permanent managerial and operational con *252 trol over all the assets of Wisconsin Central to the end that they might be integrated with Soo’s.
13. During the latter part of 1908, Soo took steps to secure control of Wisconsin Central. This latter company had never prospered, and the group of eastern capitalists then headed by the late Jules S. Bache, Newman Erb, and J. Augustus Barnard, all of New York, and N. W. Jordan of Boston (hereinafter referred to as “the eastern syndicate”) , which controlled Wisconsin Central, had already approached a number of other railroads with a view to disposing of their holdings. The method ultimately fixed upon and placed in execution was that of a long-term lease between Soo as lessee and Wisconsin Central as lessor dated April 1, 1909, for a term of 99 years. A lease of assets rather than a merger or consolidation was fixed upon because in 1909 the industry pattern for railroad and telegraph amalgamations was, and long had been, that of the long-term lease. This pattern, evolving since about 1850, was attributable directly to the inadequacy of early corporate merger and consolidation laws, especially where the corporate parties involved were incorporated in different States; regional provincialism and the dictates of local State pride which required local incorporation of all important public utilities, of which railroads were then the chief examples, and which led directly to the multi-state incorporation of many roads with the result that it often proved legally impossible to satisfy the divergent merger laws of all affected States; the relative ease with which the lease, in contrast with the more formal and cumbersome merger or consolidation, route could be successfully pursued; and the then absence of the severe income tax disadvantages of net lease arrangements which were to appear only after the enactment of the Sixteenth Amendment.
14. On January. 20, 1909, Soo for $1 million acquired 25,000 shares of Wisconsin Central common stock. Additional purchases were made thereafter so that by April 1, 1909, Soo had acquired a majority of Wisconsin Central’s outstanding common stock, i.e., 81,000 out of a total outstanding issue of 161,263 such shares. Soo’s total cost for *253 its 81,000 shares of Wisconsin Central common stock was $3,658,337.09.
15. Soo acquired the right to vote a majority of Wisconsin Central’s 112,659 outstanding shares of preferred stock through the means of an Agreement dated April 1, 1909, between Soo, Wisconsin Central, the eastern syndicate, and the Bank of Montreal as Trustee. This 1909 Agreement contained an invitation to the then holders of Wisconsin Central’s preferred stock to deposit their shares with the Trustee and to receive in exchange therefor an equivalent number of Soo’s 4-percent Leased Line Stock Certificates (hereinafter referred to as “4-percent Certificates”). Holders of Soo’s 4-percent Certificates were entitled to receive $4 per annum for each share of Wisconsin Central preferred stock surrendered, while Soo was entitled to vote the deposited Wisconsin Central preferred and to receive all dividends paid thereon. Dividends were paid on Wisconsin Central’s preferred stock at the rate of $4 per share per annum for each of the years 1909 to 1921, inclusive, but equal amounts had to be paid over to the 4-percent Certificate holders. As of June 30, 1910, some 111,316 shares of Wisconsin Central preferred stock had been exchanged for Soo’s 4-percent Certificates, and as of December 2, 1932, when Wisconsin Central’s equity receivership commenced, all of its preferred stock except for 95 shares had been so exchanged.
16. The lease dated April 1, 1909, was approved by the directors and stockholders of Wisconsin Central at meetings held prior to the time Soo took over control. The recitals of the lease stated, among other things, that “* * * it is deemed for the best interests of the parties hereto that [the lines of railway of the lessor and the lessee] should be operated together, while still retaining the separate corporate existence and status in law of the parties hereto;” and that “* * * in order to effectuate and carry out such purpose, it is essential that there should be but one management and one dstration of the operation of the two systems of rail- * * * » way;
*254 Article One provided that Wisconsin Central leased unto Soo all the lines of railway and all of the property of the lessor, including properties which it might thereafter hold, together with all rights appertaining thereto, for a term of 99 years.
Article Two provided as follows:
The Lessee shall, immediately upon the execution of this agreement have sole control of all said properties and of all operations of said railways, and of every part thereof, and all officers, agents and employees of the Lessor having to do with such control and operation, shall yield prompt and complete obedience to the authority of the Lessee with respect to the control and operation of said railways, and other properties covered hereby.
Article Three provided as follows:
The Lessee shall be entitled upon the execution hereof to the sole control of all the funds and other assets of the Lessor, whether current or accumulated, and also of all earnings of said leased railways and other properties during the term hereof (including any proceeds from the sale, rent or royalties of any and all lands now held and owned by the Lessor or held in trust for its benefit, or which it shall acquire during the term of this lease over which the Lessor has or may have control) to be used, however, wisely and prudently according to its best judgment for the sole purpose of operating, maintaining and improving the railways and other properties hereby leased, and for meeting and discharging the taxes, charges, liabilities and obligations of the Lessor pertaining thereto and any interest payable on account of the same, and, so far as may be legally possible, for the payment of such dividends on the outstanding capital stock of the Lessor as the Board of Directors of the Lessor may from time to time declare, provided, however, that the Lessee shall not in any event, commingle said earnings, funds or assets with its own, and that it shall keep and maintain with respect thereto, a separate and complete system of accounting and auditing during the full term of this lease. But said earnings, funds and assets shall stand charged in favor of the Lessors with the payments to be made for the said puiposes or for other purposes in accordance with the provisions contained in this lease.
*255 Article Four provided that the lessor was obligated to maintain its corporate existence and organization during the existence of the lease and provided that “All necessary and reasonable expenses of the due performance of the covenants and agreements * * * which the said Lessor undertakes to do and perform, shall be paid out of the earnings of the railway and other properties hereby leased, or other income of the Lessor.”
Article Five provided as follows:
Subject only to the covenant to maintain a separate accounting and all other covenants and agreements to be by it kept and performed in accordance with the terms and conditions of this lease, the Lessee shall have the right to manage, operate and administer all of the railways and other properties covered by this lease, or any extensions or additions thereto; as a part of the railway owned and operated by the Lessee: Provided, however, that if in the judgment of the Lessee it becomes necessary or expedient to operate any of said railways, terminal facilities or other appurtenances owned by the Lessor, or the use of which is secured to it by lease or other contract, permit or privilege, by and through the corporate organization of the Lessor, the Lessee shall have the full right and power to require such operation by the Lessor under the direction and supervision, however, of the Lessee; and, Provided further, that all expense of such management and administration shall be paid out of the earnings of the properties hereby demised.
Article Ten provided as follows:
The Lessee shall have the right out of the earnings of the Lessor, or from the proceeds of any bonds or stocks that may be hereafter issued by the Lessor with the consent of the Lessee, to purchase for use upon the railroads hereby demised any and all motive power, rolling stock and equipment which the business of the said railroads and the increase thereof may require; and the Lessee shall have the right to place on all the rolling stock, motive power and equipment of the Lessor, its own name or trademark, or both, in such form and manner as it shall deem best; Provided, however, that it shall also place thereon in some plain and conspicuous place the name of the Lessor; and Provided fu/rther, that all the *256 rolling stock, motive power and equipment now or hereafter owned by the Lessor shall be for the exclusive use of the railroads hereby leased, so far as the interchange of traffic, according to the custom of railroads, will permit, and except that in cases of emergency or unusual conditions of traffic, and when the same can be done without prejudice to the business on the railways hereby demised, the Lessee may hire the use of motive power or cars of the Lessor temporarily upon payment of a fair rental therefor.
Article Eleven provided that the directors of the lessor may declare dividends on the capital stock of the lessor company payable out of the net earnings of the leased properties, and that the lessee may pay such dividends out of such net earnings.
Article Fourteen provided that the lessee would continuously during the term of the lease operate the leased railroads as required by law and at all times keep, maintain, and preserve the leased railroads in good condition and repair, and would, when necessary, renew, replace, or rebuild the same, and that the renewed, replaced, and rebuilt structures should at once become and be the property of the lessor.
Article Fifteen provided that the lessee should, out of the earnings of the leased properties, pay all costs of managing, maintaining, and operating the leased property; and that all expenses that might be incurred for the joint benefit of the railway of the lessor and the railway of the lessee “* * * shall be borne by the Lessor and Lessee in such fair and equitable proportion as may be agreed upon by [them]. In the event of any disagreement as to the fair and equitable proportion of such expenses to be borne by the Lessor, the same shall be determined by arbitration * *
Article Sixteen provided as follows:
The Lessee shall and will out of said earnings from time to time, and when the same shall become due, pay all sums of money payable by the Lessor on account of any agreement or liability now or hereafter existing, and all interest on the outstanding bonds and obligations of the Lessor and on all bonds or other obligations of the Lessor hereafter issued to renew the same or for other purposes hereby authorized and, so far as may be necessary or advisable, the principal of all such bonds and *257 also all license fees, taxes, duties, and assessments, of whatsoever nature, that may be levied, exacted, required, charged or assessed, by or through the United States, or by or through any State, county, city or town, or by or through any other municipal or legal authority, on the said demised property, or any part thereof, or on the gross earnings of said demised properties or anv part thereof.
Article Twenty-one provided that the lessee should keep separate books of account with respect to all business transacted by or through the use of the leased railways.
Article Twenty-three provided that if the lessee should fail or omit to keep and perform any of its covenants and agreements for a period of 90 days, the lessor had an option to immediately terminate the lease, and that the leased railroads and all additions and improvements which shall have been made to the same should revert to the lessor.
Article Twenty-four provided as follows:
The Lessee covenants, promises and agrees to and with the Lessor, that at the end of said term or sooner termination of this lease, the Lessee will deliver and surrender to the Lessor the said demised railroads and property free from floating indebtedness incurred for maintenance or operating expenses, taxes and fixed charges and in at least as good order and condition as when delivered to the Lessee under this indenture, and with all such additions, betterments and improvements as shall have been made thereto, reasonable and usual depreciation as to any of said property subject to depreciation alone excepted, and will fully account to the Lessor for all earnings, surplus, and other assets received by the Lessee under the provisions hereof.
Article Twenty-five provided that except for the obligations of the lessee under Article Twenty-four, the lessee was not to be financially responsible for the expenses arising from the operation and management of the leased railway properties, but that all such expenses were to be paid by the lessee out of the earnings of the railways and other properties of the lessor.
There was no provision in the lease for the payment of rental and none was ever paid by Soo. *258 17. Soo came into possession of tbe Wisconsin Central properties on April 15, 1909. Soo acquired and duly exercised the full right to operate all of the assets of Wisconsin Central jointly with those of its own. Soo submerged the name of its lessor and spread its own name over Wisconsin Central’s properties, including rolling stock, motive power, stations, timetables, and tariffs. After April 15, 1909, Soo treated its own properties and those of Wisconsin Central as a single system. Earnings of both companies were, in the first instance, placed in a common pool. Charges incurred for wages, materials, taxes, interest, supplies, additions and betterments to roadway property and equipment, bond sinking funds, and other items were from day to day paid out of the common pool as they became due, without regard initially to which company was responsible for them. When the accounting for each month had been completed, the net income remaining was divided. When Wisconsin Central’s share of net earnings was insufficient to cover all of its own obligations, Soo used its own funds and then charged Wisconsin Central with the sums so spent, reimbursing itself thereafter from funds of Wisconsin Central in subsequent months. When advances were made, they were not earmarked for additions, betterments, or other pur-posfes. From 1925 through 1948, Wisconsin Central recorded the running credit balances adverse to it on its balance sheets under I.C.C. account 757 as “Non-negotiable debt to affiliated companies” and from 1944 through 1952 under I.C.C. account 770 as “Other deferred liabilities.”
18. Following execution of the 99-year lease of all of Wisconsin Central’s assets, Soo provided the system with an appropriate freight terminal in the city of Chicago at a cost of about $8 million. Adequate switching facilities were rendered available to Wisconsin Central in Chicago at minimum cost by Soo’s 1912 acquisition of a one-twelfth interest in the capital stock of The Belt Bailway Company of Chicago upon the formation of that major switching and terminal company in Chicago. By October 1913 Soo had also acquired a majority of the capital stock of Central Terminal Bailway Company, a corporation then possessed of such *259 needful facilities, with. Soo completing its full ownership of all such terminal corporation’s stock by April 1922. Both of these steps were taken with a view to enhancing the competitive position of Soo directly and as lessee of all of Wisconsin Central’s assets.
19. After Soo’s lease of Wisconsin Central’s assets, no dividends were ever paid on the common stock of Wisconsin Central. Wisconsin Central’s minority common stockholders formed a protective committee in an effort to improve their position. Under pressure from this committee, which attacked Soo’s control over Wisconsin Central’s assets, Soo in 1924 agreed to issue its own 25-year, 5y2 percent Gold Notes in exchange for Wisconsin Central’s common stock held by the minority at the rate of $43.25 maturity value of Gold Notes for each share of Wisconsin Central common stock surrendered in exchange. Soo acquired an additional 78,088 shares of Wisconsin Central common stock, which shares were pledged as collateral for Soo’s Gold Notes. Taken with Soo’s earlier purchases of Wisconsin Central common stock, Soo thus came to possess 159,088 shares of Wisconsin Central common stock out of a total of 161,263 such shares outstanding. As those Notes matured serially and were paid off in cash, Soo acquired complete title free of pledge to 22,319 shares at a cost of $965,157.44. The balance of the Wisconsin Central common stock, i.e., 56,420 shares, pledged as collateral for Soo’s Gold Notes, was surrendered to the holders of the unpaid Gold Notes in 1944 during the course of Soo’s reorganization under Section 77 of the Bankruptcy Act, as amended. During the years 1927-1930, Soo acquired 266 additional shares of Wisconsin Central common stock for $6,046.60 in cash. Soo thus acquired a total of 103,583 shares of Wisconsin Central common stock, having an original cost basis of $4,629,541.13.
20. At the close of each calendar month from June 1909 to September 1910 the balances favored Wisconsin Central, except for the two months December 1909 and July 1910, which slightly favored Soo. The monthly figures during this early period of the lease’s operation reflect only normal delays in accounting for revenues and expenditures. Com *260 mencing, however, with September 1910, the monthly figures for some time represented amounts resulting from the inadequacy of Wisconsin Central’s monthly revenues. The expected revenues of Wisconsin Central initially failed to materialize with the speed and in the volume that had been anticipated.
21. On April 11, 1911, Wisconsin Central gave Soo a promissory note for $225,000, bearing interest at the rate of 4y2 percent per annum and due one year after date, for advances theretofore made by Soo to Wisconsin Central. Subsequently, Soo advanced further sums to or for Wisconsin Central until the amount thereof totaled $1,246,000 at March 31, 1912, secured by the debtor’s deposit with the lender of $1,384,400, maturity value of Wisconsin Central’s 4-percent First and Refunding Mortgage Bonds, as authorized by Wisconsin Central’s board of directors on June 22, 1911. Soo, in April 1912, sold these bonds to the general public accompanied by its own guarantee of interest payment, and gave appropriate credit on the books to Wisconsin Central.
22. From April 1912 through February 1921 Wisconsin Central was able from operating income to pay for all of its own expenses and charges. The monthly credit balances again merely reflected usual accounting delays in effecting settlement in the running monthly balance account between Soo and Wisconsin Central throughout the period April 30, 1912 — February 28,1921, exclusive of the intervening period of Federal control and guarantee extending from December 28,1917, through August 31,1920.
23. After February 28,1921, however, Wisconsin Central’s earnings having again declined, the adverse credit balances in the monthly running account generally reflected net sums due Soo.
On March 10,1922, Wisconsin Central’s board of directors adopted a resolution which recited that during the period from September 1, 1920, to January 31, 1922, the lessor sustained “net losses from the operation” of its properties in the sum of $1,236,782.69; that during the same period, various Federal, state and local taxes had been “levied and assessed *261 against the railways and railway properties of the Lessor” which aggregated $1,368,301.09; that payment had been made “by the Lessor on account of interest, dividends and sinking funds * * * aggregating $2,349,545.03”; and payments had been made “by the Lessor on account of the principal of its Equipment Trust obligations * * * aggregating $705,-988.43”; and that all such amounts were “disbursed from month to month out of revenues belonging to” Soo “in discharge of current indebtedness of” Wisconsin Central “as temporary loans from” Soo to Wisconsin Central, “to be subsequently repaid by the latter out of funds or revenues which might be available to it.” The resolution further reads as follows:
Resolved, that the foregoing disbursements in behalf of this Company, out of revenues belonging to the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, be, and they hereby are, ratified and recognized by this Company as temporary loans to this Company, to be repaid to the Minneapolis, St. Paul & Sault Ste. Marie Railway Company out of revenues and funds which may in the future be available to this Company from any source whatsoever, and/or to be charged against this Company in mutual settlements and adjustments of accounts between the two companies; and
Whereas, it appears that further disbursements of the above described character, out of revenues belonging to the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, in behalf of this Company, may have been or may become necessary in order to properly maintain and operate the railways and railway properties of this Company:
Resolved, that such further disbursements of the above described character, out of revenues belonging to the Minneapolis, St. _ Paul & Sault Ste. Marie Railway, in behalf of this Company, as may have been or may become necessary in order to properly maintain and operate the railways and railway properties of this Company, are hereby requested and recognized as temporary loans, to be subsequently repaid to the Minneapolis, St. Paul & Sault Ste. Marie Railway Company out of revenues and funds which may in the future be available to this Company from any source whatsoever, and/or to be charged against this Company in mutual *262 settlements and adjustments of the accounts between the two Companies.
24. In May 1924 Wisconsin Central and Soo applied jointly to the I.C.C. for an order authorizing the issue and sale by Wisconsin Central of $6 million of 3-year 5%-per-cent secured Gold Notes with Wisconsin Central and Soo both assuming obligation and liability therefor. In the application it was stated that additional funds were needed for certain betterments and that Wisconsin Central “is indebted to the Soo Company for advances made in excess of $3,000,-000, repayment of which is urgently needed by the latter company in order that it may care for expenditures on its own lines.” As collateral security for the notes, Wisconsin Central pledged $8 million of its first and refunding mortgage 4-percent bonds, upon which Wisconsin Central and Soo jointly and severally agreed to pay interest.
On May 24, 1924, the I.C.C. authorized the issuance of the foregoing secured Gold Notes. The I.C.C. found that the issuance and sale of notes and the assumption of joint and several obligation and liability by both railroads “(a) are for lawful objects within their respective corporate purposes, and compatible with the public interest, which are necessary and appropriate for and consistent with the proper performance by the Soo Company of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) are reasonably necessary and appropriate for such purposes.” These notes were sold to Soo, which thereupon guaranteed them both as to principal and interest and sold them to Dillon, Read & Co. The books of account of Soo show that the sum of $3 million was credited as of June 30, 1924, to Wisconsin Central against the recorded monthly balances which then favored Soo.
By May 31, 1924, the running monthly balances showed that there was due Soo from Wisconsin Central the sum of $4,126,110.66, and that on June 30, 1924, $606,154.56 was due Wisconsin Central from Soo.
In 1926 Wisconsin Central filed with the I.C.C. the report, required under Section 20a of the Interstate Commerce Act, *263 for the year 1925 of the disposition made of securities authorized under the Act, which report reads in part as follows:
3. Total net proceeds of securities-$5, 849,086. 51
4. Purpose to which applied:
Additions & Betterments_ 2, 849,086.51
Repayment of advances to M.St.P. & S.S.M.
Ry. Co_ 3, 000, 000.00
25. The running account monthly balance favored Wisconsin Central for the four months ending June, July, August, and September 1924, but did not again return to a balance favoring Wisconsin Central until September 30, 1925, thereafter remaining favorable to Wisconsin Central only for the next two succeeding months. As of November 30, 1925, the running monthly account balance favored Wisconsin Central in the sum of $166,070.10, which was then owing from Soo, and this was the last date upon which credit balances in the running monthly account ever stood in Wisconsin Central’s favor.
26. In 1927 Wisconsin Central sold to Soo, which in turn sold to Dillon, Read & Co., $7,500,000 maturity value of its 3-year 5%-percent secured Gold Notes, guaranteed as to principal and interest by Soo. The books of account of Soo show that the sum of $718,000 was credited as of January 31,1927, to Wisconsin Central against the recorded monthly balances which then favored Soo. As of January 1,1930, Wisconsin Central sold to Soo $10 million maturity value of Wisconsin Central’s first and refunding 5-percent mortgage bonds for $8 million. Of the $8 million, Soo credited $500,000 as of January 31, 1930, to Wisconsin Central against the recorded monthly balances which then favored Soo. Wisconsin Central used the remaining $7,500,000 to retire its 1927 issue of 3-year secured Gold Notes. To pay for the Wisconsin Central mortgage bonds, Soo sold its own 5%-percent bonds, pledging Wisconsin Central’s 5-percent mortgage bond issue as collateral.
At the end of the year 1928 Wisconsin Central filed with the I.C.C. the report, required under Section 20a of the Interstate Commerce Act, for the year 1928 of the disposition made of securities authorized under the Act, which report reads in part as follows:
*264 3. Total net proceeds of securities_$7, 267, 471. 56
4. Purpose to which, applied:
Retire $6,000,000 3 Yr. 5%% Gold Notes A&B $912,457.56, Pay’t to Soo Line for advances $718,000.00_ 7, 630, 457. 56
In May 1928 Wisconsin Central paid over to Soo on account the sum of $65,000.
In June 1928 Wisconsin Central paid over to Soo on account the sum of $269,768.83.
In March 1930 Wisconsin Central paid over to Soo on account the sum of $10,000.
In April 1931 Wisconsin Central paid over to Soo on account the sum of $25,000.
As of July 1, 1931, Wisconsin Central transferred to Soo title to certain equipment used by Soo under the lease having a then depreciated value of $4,717,767.67, against which equipment trust indebtedness of $1,945,966.29 was outstanding. At the time of the transfer, Wisconsin Central was unable to make good defaulted principal and interest on the equipment which had an original cost of $6,411,501.06. The defaulted principal and interest exceeded the equity of Wisconsin Central in the equipment at the time of the transfer. As a result of this transfer, Soo’s payments on the equipment between 1926 and 1931 in the sum of $2,771,802 which had been recorded as advances to Wisconsin Central were canceled.
27. Wisconsin Central was unable to meet the interest accruing on its $10 million maturity value of 5-percent mortgage bonds sold to Soo as of January 1, 1930. To avoid a default, both debtor and creditor recorded the interest obligation as paid in their respective books of account for April 1 and October 1, 1930, 1931, and 1932. Soo reported this interest as income in its Federal income tax returns, which showed no tax due, as follows:

Amount of

Soo’s tax interest

calendar year: reported

1930_ $375, 000
1931_ 500,000
1932_ 500, 000
1,375, 000
*265 Wisconsin. Central reported the above interest as deductions from income in the consolidated income tax returns filed by Wisconsin Central and Soo.
28. Soo in the early days of the lease had not charged Wisconsin Central with interest on the balances favoring Soo. On July 14, 1924, the respective boards of both Soo and Wisconsin Central adopted resolutions reading as follows:
Whereas, On account of the existing relationship between the Wisconsin Central Eailway Company and the Minneapolis, St. Paul & Sault Ste. Marie Eailway Company and the management and operation of the former company by the latter company, it has been and is necessary to maintain certain open accounts between the two companies on which there is outstanding at times a balance owing from the one company to the other or vice versa, and it is fair and proper for the debtor company to pay interest to the creditor company on such balances.
Eesolved, That the Comptroller be instructed to ascertain in each month the balance which was owing at the end of the month before from either company to the other on each of such open accounts; and to charge interest at the rate of 5% per annum against the debtor company on any unpaid portion of such balance beginning at the end of the month following; charging no interest on any portion of any such balance which may be paid during the month in which the balance is ascertained.
Thereafter, interest was recorded on the corporate books of account of both companies as follows:

Amount of interest accrued' at annual rate of 5% against Wisconsin Central on its Calendar year: adverse balances favoring Soo

1926-$26,541.82
1927- 33,908.74
1928- 99,191.71
1929- 144, 806.22
1930- 197,225.15
1931- 262,107.71
1932- 41,160.65
Total. 804,942.00
*266 Soo ceased to accrue interest on its corporate books of account as of February 28, 1932. The foregoing sums were reported by Soo as interest income in the consolidated Federal income tax returns for the tax calendar years 1926-1932, inclusive, and deducted by Wisconsin Central in the same consolidated returns.
29. On November 30, 1932, Soo by directors’ resolution notified Wisconsin Central that the latter’s properties could not then be operated so as to yield sufficient revenues to meet the operating and maintenance expenses thereof, that Soo was not obligated to meet the deficits out of its own revenues, that Soo would cease to operate and maintain the Wisconsin Central’s properties unless satisfactory arrangements were forthwith made to furnish it with funds with which to meet the deficits to be incurred, and that Soo stood ready to deliver the possession of said properties to Wisconsin Central upon demand.
Soo’s conclusion precipitated Wisconsin Central into receivership on December 2,1932.
50. As of the end of December 1932, the adverse balance in the running monthly account with Soo totaled $7,685,14-2.-78. This total was comprised of $804,942 representing 5-percent interest charged on Wisconsin Central’s adverse monthly balances since November 30, 1925; $1,375,000 of interest on Wisconsin Central’s 5-percent refunding bonds accrued during 1930-1932, inclusive; and $5,505,200.78, representing monthly sums advanced by Soo over the term December 1, 1925-December 31, 1932. The delayed receipt of sums earned by Wisconsin Central prior to December 2, 1932, but thereafter reduced to possession, continued until 1948, amounting in all to $135,609.18 and, upon receipt, these sums were applied by Soo in reduction of Wisconsin Central’s adverse monthly balances. A further reduction of $500,000 was effected as of February 28,1939, when, pursuant to order of the District Court, it was determined that cash in that amount advanced to Soo by Wisconsin Central in October 1917 represented Wisconsin Central’s share of materials and supplies for the system and that Wisconsin Central was not entitled to receive a physical share of materials *267 and supplies on account of this 1917 cash deposit with Soo. Thus, the net adverse running monthly balance in favor of Soo as of the onset of Wisconsin Central’s receivership on December 2, 1932, was ultimately ascertained to be $7,049,533.60.
31. The order of the District Court which effected the reduction of $500,000 in the adverse monthly balances of Wisconsin Central (finding 30, swpra) resulted from the filing by Wisconsin Central’s receiver of claims against Soo in connection with Soo’s reorganization under Section 77 of the Bankruptcy Act.
Wisconsin Central’s receiver claimed an undivided interest (a) to the extent of $542,976.36 in value of the stock of materials and supplies which Wisconsin Central had at the time of the lease (1909) and then held by Soo, and (b) to the extent of $500,000 in value of the stock of materials and supplies held by Soo because of advances totaling $500,000 made by Wisconsin Central in 1917 to apply on materials and supplies. The Wisconsin Central receiver relied on a provision in the lease, in Article Twenty-four, which pertains to the obligation of the lessee at the termination of the lease to return the demised railroad and properties “free from floating indebtedness incurred for maintenance or operating expense, taxes and fixed charges and in at lease as good ordér and condition as when delivered to the Lessee under this indenture and with all such additions, betterments and improvements as shall have been made thereto, reasonable and usual depreciation as to any of said property subject to depreciation alone excepted.” It was the contention of Wisconsin Central’s receiver that Soo was required at the termination of the lease in 1932 to return to Wisconsin Central the aforementioned stock of materials and supplies, or their equivalent.
In the course of its opinion, dated February 4, 1941, the court stated:
* * * By this lease, all of the railway properties of the Wisconsin Central were leased to the debtor [Soo], giving the latter sole control of the properties and the operation thereof. The Wisconsin Central was to be *268 operated by the debtor as a division of its system, but the Lessor should be credited with all income and charged with all actual expenses of operation. The debtor company was not required to become financially responsible, in that all expenses in connection with the operation of the railway were to be paid out of the earnings of the railways which were leased. However, there is a provision in the lease, Article Twenty-four, which pertains to the obligation of the Lessee at the termination of the lease to return the demised railroad and properties “free from floating indebtedness incurred for maintenance or operating expenses, taxes and fixed charges and in at least as good order and condition as when delivered to the Lessee under this indenture, and with all such additions, betterments and improvements as shall have been made thereto, reasonable and usual depreciation as to any of said property subject to depreciation alone excepted.”
*****
When this lease was entered into, certain assets such as cash, accounts receivable and materials and supplies were turned over to the Lessee, with the provision that such property should be used wisely and prudently for the sole purpose of operating, maintaining and improving the railways and other properties which were leased. Obviously, it was necessary to use this material as it might be required in the maintenance and improvement of the properties. There is no provision in the lease, express or implied, as to any obligation resting on the Lessee with reference to the replenishment or maintenance in any specific value or quantity. One may assume that the parties recognized that the amount invested in such a stock might fluctuate and necessarily depend on the earnings of the railroad, the program laid out for future maintenance, and many other factors. The only obligation to be found in the lease resting upon the Lessee with reference to these materials and supplies is the duty to use them wisely and prudently and duly account for them. This has been done. The requirement to return the demised railroad and properties in as good order and condition as when leased cannot be construed to include the return of any specific or definite amount of personal property, which manifestly would fluctuate from time to time. The accounts receivable and cash were turned over at the same time. Undoubtedly, the parties intended to require the Lessee to account for this cash and the cash obtained from the accounts receivable, *269 and likewise to account for the other personal property. If cash belonging to the Lessor was used to buy any additional supplies, such supplies must also be accounted for. But the very nature of these assets would preclude any assumption that the expression in the lease with reference to the condition in which the demised railroad properties must be returned, refers to or embraces an intention of the parties to require the return of an equivalent amount of the various types of personal property which were delivered to the Lessee at the inception of the lease. Supplies such as are commonly found in the commissary department or in the stores department undoubtedly vary markedly from year to year in the operation of every railroad, and one does not refer to fluctuating property of this kind as “demised railroads and property.”
# ifc ifr iji #
* * * Again, it may be emphasized that the obligation to return the demised railroad and properties free from floating indebtedness does not entail a duty on the part of the Lessee to incur indebtedness for an equivalent stock of materials and supplies, which in the prudent management of the railroad the earnings did not justify. The broadest interpretation which can be given to Article Twenty-four is that ¿/ obligations were incurred, during the tenancy in complying with the terms of the lease, the properties were to be returned free from such floating indebtedness. That is, the leased railroad should not be saddled with debts of the character referred to in Article Twenty-four when the properties were returned. Article Twenty-five, however, expressly absolves the Lessee from being financially responsible in any other regard.
A very cogent answer to the Receiver’s theory herein is that tfie maintenance of a stock of materials and supplies in which the Lessor should own or have an undivided interest, was a matter of prudent management in the sound judgment of the Lessee. No showing is made that there was any breach of duty in that regard. Not only was the leased railroad returned to the Lessor in good condition, as required by the lease, but the Lessee has advanced many thousands of dollars for the operation and maintenance of the leased system, which it did not and can never recoup. * * *
% ‡ sfs
* * * Certainly, all of the transactions between the Soo Line and the Wisconsin Central should be scruti *270 nized with great care in view of the relationship of the parties, but during the entire existence of the lease, there is no evidence at this hearing of any over-reaching by the parent company, but rather a record of fairness and equitable dealing with a subsidiary to the extent that the parent advanced many thousands of dollars out of its own funds in endeavoring to operate and maintain a railroad that was not earning sufficient to carry itself. This observation is made with full recognition of the reciprocal benefits of the lease. Undoubtedly, the lease was a mutual benefit to both parties, and the Soo Line may have advanced the standing of its own properties by reason of its ability to use and operate the Wisconsin Central system. But in so far as any financial transaction was concerned, encompassed within the terms of the lease, no one has contended, and certainly the record will not sustain, any finding that there was any lack of bona fides in the Lessee’s dealings with the Lessor, and no one has asserted that, where advances were made by the Soo Line in operating the leased property, they could not be recouped from the earnings of the Wisconsin Central. That is all that the Soo Line did in connection with this $500,000 item when it offset the sum against the unpaid advances to the Wisconsin Central which remained on the books.
The court held, with respect to item (a), that the claim for priority was not sustained, and with respect to item (b), that the advances must be relegated to an unsecured claim, subject to offset by Soo’s advances to Wisconsin Central during the period of the lease.
On October 16,1941, the United States Court of Appeals affirmed the decision of the District Court.[10]
32. The onset of Wisconsin Central’s receivership, on December 2, 1932, resulted in the termination of the April 1, 1909, lease as of 12:01 a.m. on December 3, 1932, as determined by order of the District Court entered November 10, 1937. Soo, nonetheless, pursuant to a Memorandum of Operating Agreement dated December 3, 1932, with Wisconsin *271 Central’s receiver and subsequently with Wisconsin Central’s trustee, continued to operate the properties of Wisconsin Central. The operating revenues of Wisconsin Central after the termination of the April 1, 1909, lease proved sufficient to provide for the costs and expenses of the lessor. Soo continued to operate Wisconsin Central’s properties throughout the term of the lessor’s receivership and subsequent Section 77 trusteeship, as well as throughout the lessee’s own Section 11 trusteeship, pursuant to Supplements to the 1932 Memorandum of Operating Agreement dated April 15, 1944, and February 7,1945.
33. Soo in 1912 had guaranteed the payment of interest on $5,816,000 maturity value of Wisconsin Central’s 4-per-cent refunding bonds. Wisconsin Central defaulted in the payment of the April 1, 1933, interest installment due on these 4-percent refunding bonds. Soo thereupon paid the full amount of interest due, pursuant to its express guarantee. In order to preserve its rights as guarantor against Wisconsin Central and its creditors, Soo’s paying agent was required to secure and hold uncanceled for Soo’s account the interest coupons on the 4-percent refunding bonds presented for payment. Soo also paid, under similar conditions, each installment of coupon interest maturing on Wisconsin Central’s 4-percent refunding bonds as they matured through October 1, 1937. All 4-percent refunding bond interest coupons paid by Soo were held uncanceled by its paying agent for Soo’s benefit. No payments after the October 1,1937, coupon were made by Soo, which itself went into Section 77 trusteeship on December 31, 1937. The total amount paid by Soo as guarantor of Wisconsin Central’s 4-percent refunding bonds was $1,142,260.
34. Soo, Wisconsin Central, and their affiliated companies filed consolidated Federal income tax returns for the tax calendar years 1924-1938, inclusive. The consolidated net income and the net income of Soo, Wisconsin Central, and their other affiliated companies were as follows:
*272 Tax calendar year Net income on consolidated return Soo Wisconsin Central Other affiliated companies
1924-$(97,776) $501,017 $(789,272) $190,480
1925-1,835,803 1,610,274 307,667 17,962
1926-(89,968) (139,693) (117,544) 167,279
1927-191,813 553,110 (618,039) 166,742
1928-1,780,759 2,863,684 (1,108,333) 25,408
1929-1930-100,828 (4,693,815) 634,661 (2,132, 111) (379,615) (2,623,895) (54,218) 62,191
1931-(8,472,712) (5,161,177) (135,319)
1932-(9,983,808) (3,862,268) 6,287,889) 166,349
1933-(9,798,976) (6,481,765) 3,438,692) 101,381
1934-(11,220,748) (8,485,812) 2,817,889) 82,953
1935-(7,747,275) (5,716,554) 2,040,214) 9,493
1936-(6,735,186) (6,138,359) (607,452) 10,625
1937-(7,110,749) (5,905,050) (1,230,897) 25,198
1938-(8,025,956) (6,918,997) (1,173,955) 66,996
Parentheses indicate red figures; i.e., net losses.
35. The time within which Wisconsin Central’s secured, creditors under the debtor’s various mortgages were authorized to make proof of claims by filing their bills of complaint or other pleadings in the receivership proceeding was periodically extended by successive orders of the District Court on February 25, 1933; April 29, 1933; June 29, 1933; October 6, 1933; October 23, 1933; March 7, 1938; June 4, 1938; December 5,1938; and May 18, 1939. This last order of May 18, 1939, extended the filing time without limitation. In fact, no secured claims were ever filed in Wisconsin Central’s receivership proceeding which was superseded by a Section 77 trusteeship on September 30, 1944.
36. On February 19, 1938, the District Court entered an order and a subsequent amending order on June 13, 1938, requiring the filing of claims which had arisen against Wisconsin Central on or before December 2,1932, other than those secured by mortage. On October 14, 1938, Soo, itself then in trusteeship, filed its proof of claim against Wisconsin Central, claiming the amount of the recorded balances adverse to Wisconsin Central plus interest thereon. Wisconsin Central’s receiver filed objections to Soo’s unsecured claims in their entirety, but no hearings thereon were ever held in the receivership proceeding because the court was of the opinion that up to that time the question appeared to be moot and, therefore, unnecessary to be litigated.
37. On March 17, 1942, the I.C.C. approved a plan of reorganization for Soo which, as heretofore noted, on Decern- *273 ber 31,1937, had filed a voluntary petition for reorganization under Section 77 of the Bankruptcy Act, as amended. As part of its report on the plan of reorganization for Soo, the I.C.C. was required to value the assets of Soo. In connection with such valuation, in its report the Commission found:
The record shows that there are certain unpledged assets of the debtor, concerning which there is doubt as to whether they are subject to the liens of the debtor’s mortgages. Included among these is a claim by the debtor against the Wisconsin Central, which is in receivership, for interest paid by the debtor as guarantor on the latter company’s bonds, which is carried on the debtor’s balance sheet at $10; $7,104,081 of open-account advances to the Wisconsin Central against which a counterclaim for approximately $16,000,000 against the debtor has been filed by the receiver of the Wisconsin Central; 103,585 shares of Wisconsin Central common stock, carried on the debtor’s balance sheet at cost, $4,-629,541, but of doubtful value, if any, since the Wisconsin Central is in receivership; * * *
The examiner found that the value of the above-enumerated items is “highly speculative.” The protective committee for holders of Wisconsin Central first general mortgage bonds excepts to the use of this term insofar as it applies to the value of the $7,104,081 of claims of the debtor against the Wisconsin Central for advances, contending that the latter company has claims of $16,000,000 against the debtor, which should be set off against the debtor’s claims, and that the latter should be found to have no value. Answering this contention, the trustees of the debtor contend that about one-half of the Wisconsin Central claims is nothing but an assertion of offset and that the remainder of the claims is based on various items, each of which has been denied by the debtor’s trustees and has never been established or liquidated, and that, in fact, about $1,000,000 thereof has been litigated and the contentions of the Wisconsin Central receiver have been denied by the trial court and the decision affirmed upon appeal to the United States circuit court of appeals.
The above claim of $7,104,081 by the debtor for advances to the Wisconsin Central is subject to*the defense by the latter company that it used the advances in paying its floating indebtedness incurred for maintenance and operating expenses, taxes, and fixed charges, which *274 tbe debtor was obligated to pay under the terms of its lease of the Wisconsin Central which was terminated on December 3,1932. The lease provided that the Wisconsin Central properties should, upon termination of the lease, be returned free from all such indebtedness.
In view of these conflicting circumstances, we conclude and find that the value of these above-specified unpledged assets, including the claim against the Wisconsin Central, is highly speculative.
$ ‡ ‡ $
We are satisfied that the amount of current liabilities for wages, accrued taxes, vouchers payable, car-service balances payable, and other current liabilities was substantially greater than the debtor’s cash on hand and accounts receivable as of December 31, 1937, and any reasonable value which could be found for the unpledged assets above referred to. We find, in the light of this fact, that the so-called “free assets,” if any, have no value available to satisfy claims of general unsecured creditors not entitled to preference.
38. Wisconsin Central’s equity receivership was superseded as of September 30, 1944, by a trusteeship which resulted in the debtor’s reorganization under Section 77 of the Bankruptcy Act, as amended, on March 1, 1954. Extended litigation between Wisconsin Central’s numerous classes of creditors added materially to the time required to effect Wisconsin Central’s reorganization.
39. On March 1, 1945, Soo filed its claims, both secured and unsecured, against Wisconsin Central then in trusteeship. Soo’s claims consisted of (a) interest in the amount of $1,142,280 paid by Soo as guarantor on Wisconsin Central’s first and refunding mortgage 4-percent Gold Bonds and (b) advances. With reference to the interest paid, Soo claimed that it was entitled to a lien against the mortgaged properties next subordinate to the lien of the holders of the bonds. Soo made no claim for priority by reason of the advances but reserved the right to amend its proof of claim at any time either with respect to any of the foregoing or the inclusion of additional matters.
The proof of claim filed by Soo against Wisconsin Central consisted of the following items:
*275 Item 1. For interest paid by tbe claimant as guarantor on Wisconsin Central Railway Company First and Refunding Mortgage Four Per Cent Gold Bonds, due 1959, matured April 1, 1933, to
October 1, 1937, inc_$1,142,280. 00
Plus interest tbereon at 4% in tbe event interest on interest is allowed witb respect to other secured indebtedness of tbe Debtor.
Item 2. For advances by tbe claimant to tbe Debtor for Additions and Betterments from November 1, 1925, to December 2, 1932, witb adjustments to December 31, 1944_$1, 840,348.18 Interest tbereon at 5%- 1,221,459. 03
- 3,061,807.21
Item 3. For advances by tbe claimant to tbe Debtor for interest and sinking fund payments from January 1, 1930, to December 2, 1932, witb adjustments to December 31,1944— $3,128,701.02
Interest tbereon at 5%- 2,006,418.12
- 5,135,119.14
Item 4. For advances by tbe claimant to tbe Debtor for interest on $10,000,000, principal amount of tbe Debtor’s First and Refunding Mortgage 5% Bonds owned by claimant, matured April 1,1930, to October 1,1932, inclusive-$1, 375, 000. 00
Interest tbereon at 5%_ 909, 773.96
- 2,284,773.96
Item 5. For advances by tbe claimant to tbe Debtor for operating expenses from January 1, 1932, to December 2, 1932, inclusive, witb adjustments
to December 31, 1944_$342,782.12
Interest tbereon at 5%_ 207,031. 01
- 549,813.13
Total_ 12,173, 793.44

*276 * * * Priority, if any, claimed for each such item and the reasons therefor :
As to Item 1: Claimant, having paid interest as guarantor on the Debtor’s First and Refunding Mortgage Bonds, is entitled to a lien against the mortgaged properties next subordinate to the lien of the holders of such bonds against such properties.
As to that part ox the claim which is found to be a general unsecured claim, claimant is entitled to share in pari passu with other holders of general unsecured claims in any unmortgaged assets of the Debtor.
At about the same time, i.e., March 1,1945, claims against Wisconsin Central were filed by the debtor’s other creditors, both secured and unsecured. On April 13, 1945, Wisconsin Central’s trustees filed their objections to Soo’s claims, asserting in part:
* * * that during the period November 1, 1925, to December 2, 1932, the Soo Railway made net advances to the Debtor in the aggregate amount, as adjusted by subsequent collections and disbursements to December 31, 1944, applicable to the period November 1, 1925, to December 2,1932, of $6,274,566.49 and no more, and that they have no information or belief as to the amount, if any, of such advances which were made for Additions and Betterments and, therefore, put claimant to its proof. Allege that all of said advances, together with the interest thereon to December 2, 1932, except such amounts, if any, as were made for Additions and Bet-terments, constitute or are included within the term “floating indebtedness incurred for maintenance or operating expenses, taxes and fixed charges” as that term appears in Article 24 of that certain Lease dated April 1, 1909, from the Debtor to the Soo Railway requiring the Soo Railway on termination of said Lease to return the leased property to the Debtor free from such floating indebtedness. Allege that on and after the termination of said Lease on December 2, 1932, no part of such advances were, or are, as between the Soo Railway, the Soo Railroad and the Debtor, an obligation of the Debtor.
In addition, Wisconsin Central’s trustees asserted offsets and counterclaims against Soo based upon an alleged breach of contract because of Soo’s failure upon the termination of the lease in December 1932 to return the Wisconsin Cen *277 tral property free from floating indebtedness incurred for maintenance or operating expenses, taxes and other charges; and because Soo, as controlling stockholder, caused the Wisconsin Central to pay dividends on its preferred stock for years when it had no surplus net earnings. Similar objections were filed by the trustees under two of Wisconsin Central’s mortgages and by a bondholders’ committee, except that they also stated that all of Soo’s claims were floating indebtedness incurred for maintenance, operating expenses, taxes and fixed charges, and therefore were barred upon the termination of the lease. They also asserted that for many years Soo had operated Wisconsin Central as a mere agency or instrumentality of Soo; that Soo was a joint and several obligor with Wisconsin Central on the Wisconsin Central 5-percent bonds; that Soo had failed to pay the full amount of the guaranteed interest on the 4-percent bonds; and that accordingly no debt owing Soo, including the claim for $1,142,280 for payment of interest on the Wisconsin Central 4-percent bonds from 1983 to 1937, could be paid in any event until all of the mortgage bondholders’ claims for principal and interest were fully paid.
40. The claims filed by the various creditors of Wisconsin Central and the objections filed thereto raised so many questions that the District Court instructed Wisconsin Central’s trustee to confer with counsel for all the claimants and objectors to agree upon the order in which the issues thus posed should be presented to the District Court for resolution. A meeting of counsel resulted in a division of the issues into four categories.
41. On April 30, 1945, Wisconsin Central’s trustees recommended to the District Court that no action be taken on Soo’s claims unless and until it should first be determined that there were free assets of the debtor available for general creditors or that the value of Wisconsin Central’s assets was sufficient to permit Soo to participate in the reorganization plan. Wisconsin Central’s trustees, in a report to the District Court filed on April 30, 1945, recommended the foregoing order of presentation of the four categories of problems. After noting that it had read the report and recommenda *278 tions of its trustees, on tbe same day, April 30, 1945, the District Court signed an order setting for hearing the claims of secured creditors but fixed no hearing on any claim of Soo. The four groups of issues, all decided prior to those relating to Soo’s claims, were not finally resolved until 1950, hearings before the I.C.C. already having commenced on a proposed plan of reorganization for Wisconsin Central. The District Court in its order of May 23, 1949, denying, without prejudice, the petitions of the preferred stockholders’ committee and a committee of creditors for leave to file objections to the Soo claim, noting that objections thereto had been filed previously by other parties, expressed the opinion that up to that time the question appeared to be moot and, therefore, unnecessary to be litigated unless the preferred stockholders were accorded recognition in the reorganization, or there would be an equity for that stock if the claim were eliminated, or the fairness or equity of the plan would be affected by the allowance thereof.
42. Soo participated in the litigation over certain of the foregoing four sets of issues. Soo was sustained in its opposition to the contentions of certain of Wisconsin Central’s mortgage trustees that interest was properly allowable on past due interest on bonds issued under their mortgages.[11] Had the mortgage trustees prevailed, the assets available to satisfy unsecured creditors’ claims would have been greatly diminished. Soo was unsuccessful in its attempt to establish that the bondholders were entitled to have the income from the mortgaged properties impounded for their benefit only from the date of their petition seeking such impoundment, i.e., November 11, 1937, instead of from the onset of the receivership, i.e., December 3, 1932.[12] Had Soo prevailed in this instance, the income of Wisconsin Central for nearly five years would have been available for distribution to unsecured creditors instead of being impounded for the benefit of the mortgage bondholders.
43. In the proceedings for reorganization of Wisconsin Central, pursuant to the provisions of Section 77 of the *279 Bankruptcy Act, the I.C.C. held hearings in 1944 and 1945 on two different reorganization plans submitted by committees of mortgage bondholders. Under the first plan of reorganization, as submitted by a committee of mortgage bondholders (entitled the first general committee) :
The interests or equities of (1) holders of claims against the debtor entitled to priority or preference oyer the claims of general creditors, but not over outstanding bonds secured by any one or more of the mortgages, (2) general creditors of the debtor, (3) holders of preferred stock of the debtor, and (4) holders of common stock of the debtor would be deemed to have no value and nothing would be distributable to them under the first general committee’s proposed plan.
Under a second plan of reorganization, as submitted by a committee of bondholders (entitled refunding committee):
The interests or equities of (1) all general unsecured creditors whose claims are not entitled to priority over the mortgages of the debtor, (2) holders of the present preferred stock of the debtor, and (3) holders of the present common stock of the debtor would be deemed to have no value, and no provision with respect to the same would be made in the joint plan.
Soo did not object to either of the foregoing plans but proposed that the plan provide for the establishment of a revolving fund of $1 million to reimburse Soo for any deficits that might be sustained by it in operating the property of the reorganized company.
Neither of the two foregoing plans was ever put into effect.
44. Under date of August 26, 1946, Soo submitted a “Memorandum to the Commissioner of Internal Revenue Relating to the Deductibility of Losses Sustained by Minneapolis, St. Paul & Sault Ste. Marie Railroad Company as a Result of Certain Claims against Wisconsin Central Railway Company Found to be Uncollectible and Worthless.”
The memorandum recited the historical background of Soo’s claims against Wisconsin Central.
*280 With respect to the circumstances which prompted Soo’s decision to terminate its lease of the Wisconsin Central properties in December 1932, the memorandum stated:
The old Soo Line, noting no substantial improvement in the earnings of the Wisconsin Central, late in 1932 determined that it could no longer continue to deplete its own resources in order to assist the Wisconsin Central, and concluded to surrender possession of the properties back to that company. * * *
:Jc jfc ‡ ‡
* * * The old Soo Line did not allow the Wisconsin Central obligations to go unpaid during the depression period of 1930-1932, but paid them with its own funds. It was not the fact of such payment by the old Soo Line nor the existence of its open account claim against the Wisconsin Central that precipitated the receivership, but it was the surrender by it of the leased properties upon its recognition that it could not go on indefinitely paying the obligations of a company that was unable to earn enough to meet its expenses. * * *
The memorandum stated that upon consummation of the plan of reorganization of Soo, the only financial interest in Wisconsin Central which Soo retained was its interest in Wisconsin Central’s common stock and the claims which were the subject of the memorandum. Respecting the common stock, the memorandum stated:
Hope of recovering anything on the common stock was abandoned fairly early in the Wisconsin Central receivership proceeding because of outstanding bonded indebtedness aggregating $43,759,000 principal amount and the existence of the $11,265,900 par value of preferred stock and the aforementioned claims of the old Soo Line. The old Soo Line neither claimed nor obtained any tax benefit from its loss on Wisconsin Central common stock.
The memorandum then recited as follows:
Summarizing, the principal amounts of the claims of the old Soo Line (now new Soo Line) against the Wisconsin Central are as follows:
Advances of cash-$5, 311, 831.32
Interest on bonds owned_ 1, 375, 000. 00
Interest paid as guarantor_ 1,142,280. 00
Total, principal amount. 7, 829, 111. 32
*281 Simple interest computed to December 31,1945, at the rate of 5 per cent on the first two items and at the rate of 6 per cent on the last item, increases the total amount of the claims to $13,228,501.61 * * *.
In setting forth the Wisconsin Central’s receivership proceedings, the memorandum stated:
The new Soo Line took an active part in the litigation of these issues. It contended that, under New York law (which was the applicable law) interest is not allowable on overdue coupons which remain attached to the bonds to which they relate. It also contended that, until the mortgagees took steps to effectuate their liens upon the rents, issues and profits, such rents, issues and profits properly belonged to the general creditors. It contended that the Wisconsin Central mortgagees took no such steps until they filed impounding petitions in the receivership proceeding on November 11, 1937.
4$ ‡ #
However, the Court disagreed with the position of the new Soo Line with respect to the necessity for the mortgagees to take steps to effectuate their liens upon income. It held, in effect, that all of the receivership income was subject to the liens of the mortgages.
4: 4* % 4s #
* * * It was not until the Court, on January 18, 1946 (64 F. S.upp. 251), decided that the mortgagees were entitled to all of the receivership earnings and a subsequent similar decision by the 8th Circuit Court of Appeals, in Brooks v. St. Louis San F., 153 Fed. 2d. 312, that the old Soo Line’s claim appeared to be worthless.
In setting forth Soo’s conclusions, the memorandum stated:
2 * * *
(b) That the worthlessness of such claims [for the advances] was established when the Court, on January 18, 1946, decided the impounding of income issue adversely to the new Soo Line and thus, in effect, found that there were no free assets of the Wisconsin Central available for its general creditors.
jji ❖ # ❖
* * *
(b) That the worthlessness of the claim [for the guaranty of interest] was established when the Court, on January 18, 1946, decided the impounding of income issued adversely to the new Soo Line and thus, in ef- *282 feet, found that there were no free assets of the Wisconsin Central available for its general creditors (it having been determined subsequent to January 18,1946, that the assets subject to the lien of the Wisconsin Central First & Refunding mortgage are insufficient to satisfy in full claims of the holders of the First & Refunding bonds and that the claim of the old Soo Line based upon the aforesaid coupons has been relegated to the status of a general claim).
In a postscript to its memorandum, Soo quoted an I.C.C. examiner’s proposed report on Wisconsin Central’s reorganization, which recommended that all claims against Wisconsin Central having preference over general claims but not over bonds, all general claims and all preferred and common stocks be found to have no value.
Soo also noted that the examiner likewise made reference to the court’s decision of January 18,1946, holding that the receivership income was impounded for the benefit of the bondholders from the beginning of the receivership, as an additional reason supporting his finding as to lack of value.[13]
45. In its corporation income tax return for the calendar year 1946, Soo claimed bad debt losses only on account of interest in the sum of $1,142,280 it had paid as guarantor on Wisconsin Central’s first and refunding mortgage 4-percent Gold Bonds. On its corporation income tax return, Soo stated:
The identifiable event which established the worthlessness of this claim was the release on August 1, 1946, by the Interstate Commerce Commission, of the reorganization plan recommended by the I.C.C. examiners which excluded the holder thereof from participation in the plan.
In an accompanying supplemental memorandum, Soo stated in part as follows:
Subsequent to April 1, 1909, Predecessor acquired a substantial investment interest in the Wisconsin Central ; became the owner, by purchase, of $16,000,500 of a total of $16,126,800 par value of the common stock outstanding. Predecessor, also, acquired practically all *283 rights of ownership in most of the preferred stock by an exchange of its “Leased Line Certificates” for Wisconsin Central preferred stock. In addition, the Predecessor acquired $10,000,000 principal amount of the First and [Refunding 5% Bonds of the Wisconsin Central. Upon consummation of reorganization of the Predecessor Corporation, a large part of its investment interest in the Wisconsin Central was wiped out.
In order to tide the Wisconsin Central over a period of low earnings which preceded the receivership of the Wisconsin Central in 1932, the Predecessor found it necessary to make substantial advances of funds. Furthermore, in order to assist the Wisconsin Central in its financing operations, the Predecessor obligated itself as guarantor with respect to the interest on $5,816,000 principal amount of Wisconsin Central First and Refunding 4% Bonds. As guarantor of such interest payments the Predecessor paid interest in the total amount of $1,142,280 on such bonds for the period April 1,1933 to October 1,1937 inclusive. The principal amount of Predecessor’s claims against the Wisconsin Central for advance interest on bonds held by Predecessor and interest paid as guarantor was $7,829,111.32. The claim for $1,142,280 representing interest paid on Wisconsin Central First and Refunding 4% Bonds paid by the Predecessor Corporation, as guarantor, is the only claim against the Wisconsin Central for which taxpayer is claiming deduction as a worthless debt as it had a different status than other claims. This interest was paid subsequent to the Wisconsin Central receivership under a separate guarantee undertaking. There seemed a good possibility of recovery in respect to this claim until the year 1946.
# * # % *
If the Court had decided the impounding question in the manner urged by the Successor Corporation, there would have been available for general creditors all of the net receivership earnings of the Wisconsin Central attributable to the period prior to November 11,1937, and such earnings were substantial being in the amount of about $1,900,000.
It was not until the Court, on January 18, 1946 (64 F. Supp. 251), decided that the mortgagees were entitled to all of the receivership earnings and a subsequent similar decision by the 8th Circuit Court of Appeals, in Brooks v. St. Louis San F., 153 Fed. 2d. 312, that the Predecessor’s claim appeared to be worthless.
*284 Another identifiable event which established the worthlessness of this claim also occurred in 1946; being the release on August 1, 1946, by the Interstate Commerce Commission, of the reorganization plan recommended by the I.C.C. examiners which excluded the holder of the aforesaid claim from participation in the plan. [14]
46. A letter dated April 4, 1947, from the Acting Deputy Commissioner of the Internal Revenue Service to Soo reads in part as follows:
Reference is made to your brief dated August 26,1946, addressed to the office of the internal revenue agent in charge, St. Paul, Minnesota, together with accompanying exhibits, relating to the deductibility of losses aggregating $7,829,111.32, principal amount, exclusive of interest, on account ox the uncollectibility and worthlessness of claims against the Wisconsin Central Railway Company.
* # ‡ * *
The question as to the worthlessness of a debt is fundamentally factual, and the sole issue is whether the debt is deductible in 1946.
Section 29.23(h) (1) of Treasury Regulations 111 provides in part as follows:
“Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for the purpose of deduction.”
The right to a bad debt deduction in the year in which it is sustained is not affected by the remote possibility that your claims would be paid from the impounded income. The law impresses no requirement that a taxpayer be an “incorrigible optimist”. United States v. S. 8. White Dental Mfg. Company, 274 U.S. 398, and the general requirement that losses be deducted in the year sustained calls for a practical test, not a legal test. Lucas v. American Code Co., 280 U.S. 445. A taxpayer is not required to establish beyond the possibility of doubt that nothing would ever be realized upon the claim.
Based upon the foregoing, it is the opinion of this office that the claims agamst the Wisconsin Central Rail *285 way Company were worthless and uncollectible in the hands of your predecessor corporation, hence a deduction for the amount of such claims or any part thereof is not allowable in computing the net income of your corporation for the taxable year 1946 or any prior taxable year.
With respect to the interest computed to December 31, 1945 and added to the principal amount of the claims in computing the amount of the loss for which a deduction is claimed, it is not contended that any part of such interest was included in taxable income. In this connection your attention is invited to the provisions of section 29.23 (k)-2 of Regulations 111 providing, in part, for the disallowance as a deduction of items unless the income such items represent has been included in the return of income for the year for which the deduction is claimed or for a previous year. Accordingly, a deduction for the amount of such interest is not allowable in computing your net income for the taxable year 1946 or any prior taxable year,
47. On June 3,1947, Division 4 of the I.C.C. issued its report and order approving a plan of reorganization of Wisconsin Central.[15] The report contained a valuation of the assets of Wisconsin Central which reads as follows:
1. Booh assets and 'valuation data. — The balance sheet of the debtor as of June 30, 1945, shows the following-assets : Investment in road and equipment, $79,935,446; improvements on leased property, $135,494; (credits for donations and grants, $334,903; accrued depreciation, road, $525,267; accrued depreciation, equipment, $6,014,076; accrued amortization of defense projects, road, $105,569; and accrued amortization of defense projects, equipment, $1,480,418); or total investment in transportation property, less recorded depreciation and amortization, $71,610,707. Other investments consist of the following items: Sinking funds for the first general mortgage, $1,047,047; capital and other reserve funds, $974,003; maintenance funds (cash), $933,196; miscellaneous physical property, $279,543; investments in affiliated companies, $203,312; and other investments, $9,695; a total investment, less recorded depreciation and amortization, of $75,057,503. Current assets were $11,- *286 962,320, including $5,097,997 in cash, $3,810,000 in United States Government securities, $807,623 in special deposits, and $1,270,149 in material and supplies. Deferred assets were $1,450,000, and unadjusted debits were $3,024,986. Total assets were $91,494,809.
Liabilities shown on the same balance sheet are as follows: Capital stock, $30,000,000; long-term debt, $45,604,878; current liabilities, $2,243,574; deferred liabilities, $25,132,913; unadjusted credits, $2,491,269; and corporate deficit, $13,977,826. Current liabilities include audited accounts and wages payable $137,171, interest matured unpaid $807,460, unmatured interest accrued $2,799, and taxes accrued $1,296,144. Deferred liabilities include bond interest in default, $17,988,440.
The following valuation data, taken from a report by the Commission’s Bureau of Valuation on the elemente of value of the debtor’s property which was filed in the proceedings by our direction pursuant to the provisions of section 77 (c) (11) of the Bankruptcy Act, were determined in accordance with methods frequently explained in the Commission’s valuation reports[16] under section 19a of the Interstate Commerce Act:
As of December 31, 1943, the original cost of the debtor’s owned property, except land and rights, was $63,726,978; cost of reproduction new was $83,440,156;[17] cost of reproduction less depreciation was $56,322,881; and the value of land and rights was $4,636,887 (including $645,028 for noncarrier lands).
2. Traffic and revenues. — Total railway operating revenues of the debtor for the years 1923 to 1944, inclusive, were as follows:
Period Amount Period Amount
Year 1923_. $20,388,242 Year 1934.. $9,755,777
Year 1924.. 19,220,666 Year 1935-
Year 1925.. 20,405,515 Year 1936-111
Year 1926.. 19,913,023 Year 1937-
Year 1927.. 19,744,628 Year 1938..
Year 1928-19,630,157 Year 1939..
Year 1929-19,527,564 Year 1940..
Year 1930.. 15,723,198 Year 1941..
Year 1931-12,317,995 Year 1942..
Year 1932-9,482,975 Year 1943..
Year 1933.. 9,426,653 Year 1944.. 1 22,172,208
1 Information submitted and filed in the Commission's docket since the close of the hearing shows $21,317,591 for the year 1945 and $22,616,995 for the year 1946.
*287 From the standpoint of revenues, manufactured and miscellaneous products comprise the most important group of commodities handled by the debtor. Next in order of importance are products of agriculture, mines, forests, animals and their products, and l.c.l. freight. In 1938, about 45 percent of the debtor’s carload traffic, in terms of revenues, originated on its lines, and about 55 percent was received from connections. Of the total revenues, about 17 percent was derived from traffic interchanged with the Soo, and about 14 percent from exclusively overhead traffic with respect to the Wisconsin Central. In 1940, these proportions were not substantially different.
In the course of its report giving approval to a plan of reorganization for Wisconsin Central, the I.C.C. stated:
Our analysis of the record discloses no free assets. Inasmuch as the total amount of new securities issuable under the plan is insufficient to satisfy the claims of secured creditors, we find that there is no value attaching to any claims not entitled to priority over the mortgages. Thus, we find that the claims of unsecured creditors, and the debtor’s preferred and common stock have no value and the holders thereof may not participate in the reorganization.
The plan of reorganization which Division 4 of the I.C.C. approved on June 3, 1947, allocated neither cash nor securities to Soo’s claim for interest on the 4-percent bonds paid and held by Soo, its unsecured claim and its stock. Soo did not file a petition for reconsideration, rehearing, or modification of the I.C.C. order of June 3,1947.
48. Due to a marked improvement in Wisconsin Central’s economic position, petitions for modification as well as requests for a reopening of the proceeding were filed on behalf of bond and mortgage holders with the I.C.C. on August 1, 1947. Division 4 of the I.C.C. thereafter ordered a reopening of the proceeding on February 2,1948. The reopened hearings got under way in June of 1948, and were successively adjourned until November 14, 1949. Briefs were filed on February 16, 1950, and a second examiner’s proposed report was issued on December 8, 1950, upon which further argument was heard by the I.C.C. on April 26, 1951.
*288 49. On March 17, 1952, the I.C.C. issued a supplemental report approving a modified reorganization plan for Wisconsin Central. The I.C.C. noted that since its initial hearings in 1945, circumstances had changed. The earnings of the debtor had been very good and its investment in railroad property had been increased and modernized by about $9 million (although offset by $2,700,000 in new obligations). In addition, between July 1,1947, and August 31,1951, it had reduced principal and defaulted interest obligations on mortgage bonds by about $7,700,000.
In its supplemental report the I.C.C. noted that under the reorganization which it had approved in 1947, “It was found that the claims of unsecured creditors and the holders of the debtor’s preferred and common stocks have no value and nothing should be distributed to them in the reorganization.” The I.C.C. further observed that under the reorganization plan which it had approved in 1947, the value for the reorganized company warranted a capitalization as of July 1, 1947, of only $46,840,600, divided between debt and stock in the amounts of $23,149,600 and $23,691,000, respectively However, the forecast of normal year earnings upon which the 1947 reorganization plan had been based had been completed in 1942, and predicated on its experience from 1923 to 1941, inclusive, there was only $1,505,000 per annum available for fixed charges after depreciation but before income taxes. But based on a forecast made with data running through 1950, the I.C.C. found Wisconsin Central’s normal year earnings available for fixed charges before Federal income taxes to be about $3,150,000.
Although the Soo did not argue for an increased capitalization, the I.C.C. determined that the cost of reproduction less depreciation, based upon inventory of the Wisconsin Central’s assets as of the end of 1946, was $61,452,000, which, plus the value of land and rights of $4,374,000, totaled $65,-826,000 — in lieu of the $60,959,000 determined in the 1947 report based upon 1943 data. Having in mind the increased *289 value of tbe assets, the reduction in liabilities, and the increase in earning power, the I.C.C. concluded that the value of the Wisconsin Central assets could support a new capitalization of $59 million, inclusive of about $3 million of equipment obligations, rather than the $46,800,000 it had previously approved in 1947.
The I.C.C. having authorized a total of 208,000 new common shares in the reorganized Wisconsin Central and having allocated 173,930 to secured creditors and Soo’s interest claim, this left 34,070 for satisfaction of three unsecured claims. The I.C.C. authorized these new shares to be divided among unsecured creditors to the extent their claims were found valid by the court; namely, Soo’s claim for advances from 1925 to 1932, the claim of 4-percent bondholders of Superior & Duluth Division (of Wisconsin Central) for 1-percent interest on their bonds (stipulated to be $3,400,000) not secured by liens from the beginning of the receivership, and a similar claim for 1-percent unsecured interest by first and refunding 5-percent bondholders ($1,975,000). If Soo’s claim were reduced by the court below face value, the I.C.C. authorized the distribution of 120 percent of stated value in new common stock for each dollar of claim allowed.
The I.C.C. supplemental report of March 17, 1952, reads in part as follows:
On the same basis of calculation and prospective earnings, we find that the Soo’s interest claim in the amount of $1,142,280, conceded by the Soo to be subordinate to the claims of holders of the refunding bonds (both 4 and 5 percent issues) for principal ana interest at the rate of 4 percent, should be recognized in the reorganization through the exchange of new common stock at the rate of $1,300 (stated value) per $1,000 of claim. This would require 14,850 shares. In our opinion, this treatment is justified by the acknowledged subordination of this claim to other secured claims.
CO ® *290 refunding 4-percent bonds, is disputed by various parties, including the debtor, which is seeking, in the district court, to litigate these claims, together with the question of their subordination, and of the Canadian Pacific secured claim, to the stockholders’ equities.
Hearing upon and consideration of the Soo’s claims by the court has been deferred “until it is determined in this proceeding either (a) that there are free assets of the debtor available for general creditors, or (b) that the value of the mortgaged properties of the debtor is sufficient to permit participation therein by the Soo either as a general creditor or as the holder of a secured claim.” By order of May 23,1949, the court denied a motion of the preferred-stockholders’ committee for leave to file objections to the Canadian Pacific claim. Also, by the same order, the court denied the committee’s petition to file objections to the Soo’s claims and for an examination of books and records, without prejudice, however, to affording such opportunity in the future, “if the preferred stockholders are accorded recognition in the reorganization, or if there will be equity for that stock if the Soo Line claim is eliminated, or if the fairness and equity of the plan will be affected by the allowance of the Soo claim.” Accordingly, the committee, in the proceeding before us, states that it does not object to deferment of the issues raised by it with respect to the Soo claims. In our opinion, no showing has been made on this record which would require, as a prerequisite to the adoption of a fair and equitable plan, the disclosures sought by this committee with respect to the acquisitions of bonds owned by the Canadian Pacific.
* * # # #
Revenues, earnings, normal year and other forecasts. — The debtor’s past revenues and income available for fixed charges for the years 1923 to 1946, inclusive, with certain period averages, were stated in division 4’s report in this proceeding. For convenience, these and other factors of the income account for the years 1933 to 1950, inclusive, embracing the period of the receivership and the bankruptcy proceedings, with averages for various periods, are set forth below:
*291 Period Total railway operating revenues Percent expenses of revenues Income before fixed charges and Federal income taxes Income1 before fixed charges Income1 available for bond interest
Year 1933.. $9,426,653 78.11 $3,887 $3,887 2 $225,817
Year 1934.. 9,755,777 76.32 359,441 359,441 148,771
Year 1935.. 10,375,853 76.64 641,479 641,479 456,336
Year 1936.. 12,442, 111 70.13 1,606,978 1,606,978 1,183,286
Year 1937.. Year 1938-12,719,228 10,635,742 73.02 82.45 1,617,874 2 47,039 1,617,874 2 47,039 1,270,209 2 279,801
Year 1939-12,818,148 71.02 2,012,795 2,012,795 1,813,007
Year 1940-13,837,639 70.08 2,348,636 2,348,636 2,160,166
Year 1941-16,353,565 67.73 3,331,641 2,981,541 2,806,396
Year 1942.. 20,005,843 65.43 5,102,865 3,917,951 3,760,444
Year 1943-21,812,151 69.50 5,047,549 3,302,112 3,178,302
Year 1944.. 22,172,208 74.47 3,565,083 2,624,968 2,507,766
Year 1945-21,317,591 79.57 2,658,742 1,692,270 31,597,671
Year 1946-22,616,995 80.65 1,750,484 2,961,290 2,883,328
Year 1947-26,443,477 72.51 4,160,004 3,615,004 3,537,104
Year 1948-29,734,080 72.31 5,067,737 4,092,737 4,008,717
Year 1949.. 26,215,973 79.97 2,158,368 2,181,097 2,090,548
Year 1950.. 29,430,789 72.39 4,697,108 3,580,108 3,493,796

Averages

18-yr. (1933-50). 18,228,546 73.86 2,560,196 2,194,663 2,021,679
15-yr. (1036-50). 19,903,702 73.54 3,005,248 2,565,888 2,400,729
12-yr. (1939-50). 21,896,538 73.37 3,491,743 2,942,542 2,819,770
10-yr. (1941-50). 23,610,267 73.69 3,753,948 3,094,908 2,986,407
5-yr. (1942-46).. 21,584,958 74.09 3,624,944 2,899,718 2,785,502
4rjr. (1947-50)..
27,956,079
74.24
4,020,804
3,367,236
3,282,541
1 Amounts in these two columns are after Federal income taxes; except that in the years 1933-1940, inclusive, there were none. In the 10 years 1941-1950, these taxes, after allowance for credits of $1,210,806 in 1946 and $22,729 in 1949, averaged $659,040 annually. Last column reflects deduction of rent for leased road and equipment, interest on unfunded debt, and amortization of discount on funded debt.
2 Deficit.
3 Operating expenses for 1945 reflect $1,368,464 of unusual charges for amortization of defense projects and property retirements.
For the year 1951, results_ of operations were as follows: Total railway operating revenues, $30,990,686; operating ratio, 80.86; income available for fixed charges and Federal income taxes, $1,714,774; and income before fixed charges, after taxes, $1,946,122 (reflecting an income tax credit of $231,348).
The fixed charges of Wisconsin Central for the years 1933 to 1950, inclusive, were as follows:
1933_$2,188,857 1942_$2,005,836
1934_ 2,215,430 1943_ 1,974,170
1935_ 2,290,147 1944_ 1,967,562
1936_ 2,591,100 1945_ 3,394,959
1937_ 2,566,441 1946_ 2,078,322
1938_ 2,510,216 1947_ 2,078,260
1939_ 2, 049,127 1948_ 1,975,000
1940_ 2, 037, 819 1949_ 2, 049,459
1941_ 2,027, 536 1950_ 1,783,613
*292 Wisconsin Central’s income statement, as filed with, the I.C.C., showed fixed charges to consist of rent for leased roads and equipment; interest on funded debt; interest on unfunded debt, and amortization of discount on funded debt.
If effect had been given to road depreciation accounting, approximately $218,000 a year would also have had to have been deducted in arriving at the operating revenues and income available for fixed charges and for bond interest for the years through 1941.
50. On September 15, 1952, the I.C.C. issued a second supplemental report, further modifying and approving a reorganization plan for Wisconsin Central. This latter plan was certified by the I.C.C. to the District Court on September 26, 1952; a hearing was held thereon before the District Court on November 24,1952; the District Court on April 8, 1953, issued its opinion of approval;[18] and on April 17,1953, its final findings and conclusions approving the proposed reorganization plan. On appeal from the District Court’s order taken by the debtor, the United States Court of Appeals affirmed on February 3, 1954.[19] The I.C.C. certified to the District Court the participating creditors’ vote on the approved plan, and the District Court on October 1, 1953, confirmed the plan. The debtor’s appeal from this order was dismissed by the United States Court of Appeals on February 3, 1954. Consummation of this final Wisconsin Central plan of reorganization took place March 1,1954, and the formal consummation order transferring the properties from the old Wisconsin Central to the new Wisconsin Central was duly recorded and filed. The actual closing took place on March 10, 1954, and exchanges of old securities for new securities began on March 12, 1954. Subsequent efforts of the old debtor to have the already consummated reorganization plan upset were unsuccessful and the plan’s March 1,1954, consummation remained undisturbed.
51. Early in 1951, after the District Court’s resolution of all the four sets of issues contained in the Wisconsin Central trustee’s recommendations of April 30, 1945, Soo was notified by the trustee that Soo’s claims were to be set down for *293 hearing. Objections were filed by all the secured creditors and by the debtor and its trustee. The objections included the objection that the claim for advances did not survive the termination of the lease. Also, claims for offset in the sum of about $3 million were made against Soo for alleged improper and unlawful profits it had made on $10 million in bonds issued to it by Wisconsin Central in 1930 for only $8 million, and for $1,145,000 in alleged unlawful dividends Soo had received on Wisconsin Central preferred stock. A 3-day hearing on Soo’s claims was held before the District Court commencing March 4,1952. Subsequent to the receipt on April 7, 1952, of the transcript of record, but prior to the May 7, 1952, due date for initial briefs, Soo was approached, by certain of those parties opposed to Soo’s claims, with a compromise proposal.
52. After the District Court’s March 4-6,1952, hearing on Soo’s claims, all the parties, except Wisconsin Central itself and a committee of its preferred stockholders, entered into negotiations which culminated in their adoption, under date of May 12, 1952, of a “Stipulation and Agreement.” This Stipulation and Agreement, which, among other things, conclusively fixed an upper limit upon the extent of any possible recovery by Soo upon its claims against Wisconsin Central, was presented to the District Court for its approval which was duly forthcoming by order dated August 21, 1952, over the opposition of the debtor corporation, Wisconsin Central, and the preferred stockholders’ committee, whose appeal to the United States Court of Appeals was dismissed per curiam, on December 29, 1952.[20] The Agreement was found by the approving District Court to have been “negotiated in good faith and through bargaining at arm’s length between the Soo and parties to this proceeding representing all persons interested in this proceeding whose rights would, under existing circumstances, be prejudiced by the allowance of said claim of the Soo in any amount whatsoever.” The District Court also found that during the course of their negotiations leading up to the execution of the May 12, 1952, Stipulation and Agreement the “parties had the benefit of *294 the evidence introduced at said tbree-day hearing on said claim of the Soo and the objections thereto and of detailed studies of the facts and law applicable thereto; * * * [that] the Soo and said parties and the Trustee of the Debtor agreed and stated to the Court at said hearing that the proposed compromise is a fair and reasonable one and results in the allowance of the said claim of the Soo in amounts which are within the limits of what this Court might reasonably allow if the litigation with respect to such claims and the objections thereto were to be prosecuted to final conclusion.”
The District Court further stated:
This Court has not attempted to arrive at a final decision on the difficult issues of fact and of law presented by said claim and the objections thereto but, after hearing the evidence and the arguments of counsel * * * believes that the proposed compromise is a reasonable and proper one and is an equitable disposition of said claim and of the objections thereto.
S3. The Stipulation and Agreement, dated May 12, 1952, stated that the parties were desirous of compromising their conflicting contentions and concluding as soon as possible a reorganization of Wisconsin Central within the framework of the plan of reorganization set forth in the I.C.C.’s supplemental report and order of March 17,1952. The parties, among other things, all bound themselves to support the then pending I.C.C. March 17, 1952, supplemental report and order containing Wisconsin Central’s reorganization plan.
The parties agreed that none of them would petition the I.C.C. for any modification of its supplemental report and order of March 17, 1952, except with regard to specified matters. They agreed with respect to the amounts to be allowed claims of the various mortgage bondholders of Wisconsin Central and its subsidiaries, and also with respect to priorities and amounts and interest to be allowed. They agreed that all setoffs and counterclaims against Soo because of alleged domination of Wisconsin Central would be abandoned,- unless the plan of reorganization should be set aside by the court.
*295 Insofar as 'Soo’s claims were concerned, the Stipulation and Agreement expressly provided in Sections 4 and 8 that:
4. The parties agree that the claim of the Soo based, on its payment of 4% interest coupons on the First and Refunding Mortgage 4% Bonds shall be allowed as a secured claim in the amount of $1,142,260 without interest thereon, to be satisfied in accordance with the priority provisions of such Plan; and that the claim of said Soo for advances to the Wisconsin Central prior to receivership shall be allowed in the principal amount of $750,000, without interest thereon, as an unsecured claim to be satisfied in accordance with the priority provisions of such Plan; and that they will support an application to the Bankruptcy Court for the allowance of said claims in said amounts.
# # if: :jc %
8. The contention that the holders of First and Refunding Mortgage 5% Bonds are entitled, in respect of their unsecured claim for interest at the rate of 1%, to be subrogated to the rights of the Soo with respect to the allocation of new securities, is reserved for subsequent determination by the Bankruptcy Court.
54. On August 21, 1952, the court entered findings in accordance with the Stipulation and Agreement. The findings noted the position of the objecting parties with respect to Soo’s claims
* * * that any claim of the Soo against the Debtor should be denied in full or in part or fully or partially subordinated to the claim of all other creditors and stockholders of the Debtor by reason of the alleged domination of the Debtor by the Soo or otherwise, and that all or most of the said unsecured claim on account of open account advances did not survive the termination of the lease of April 1, 1909, from the Debtor to the Soo, which lease was terminated as of December 2, 1932. * * *
Although in its conclusions of law the court approved the compromise between Soo and the secured creditors, it noted that none of the preferred stockholders nor the debtor had been given a chance to object to the settlement because the I.C.C. found no equity available for them in any event. *296 Therefore, subject to the provision that the debtor oh its stockholders could have the order vacated if prior to the final consummation of the plan of reorganization it could be shown that the preferred Stockholders could share in the reorganization, the court allowed Soo’s claim for payment of interest coupons on mortgage bonds between 1933 and 1937, in the amount of $1,142,260, without interest, as a secured claim; and Soo’s claim for advances prior to December 3, 1932, in the amount of $750,000, without interest, as an unsecured claim. The District Court reserved for subsequent determination the contention of the 5-percent bondholders that with respect to their unsecured claim for 1-percent interest they were entitled to be subrogated to the rights of Soo with respect to any securities Soo might get.
55. Under the I.C.C.’s March 17,1952, plan of reorganization for Wisconsin Central, which was duly consummated March 1,1954, Soo was entitled to receive 1.3 shares of common stock in the new Wisconsin Central for each $100 of its secured claim of $1,142,260 for interest paid as guarantor of Wisconsin Central’s 4-percent refunding bonds. In addition, Soo was also entitled to receive 1.2 shares of common stock of the new Wisconsin Central for each $100 of its unsecured claims allowed by the District Court pursuant to the Stipulation and Agreement, i.e., to the extent of $750,000. Soo thus became entitled to receive 14,849.38 shares of the common stock of the new Wisconsin Central for its secured claims and 9,000 shares for that portion of its unsecured claims allowed by the District Court, or 23,849.38 such shares in all, subject to a continuing dispute between Soo and certain other of Wisconsin Central’s creditors over Soo’s just entitlement to any of these shares.[21] This dispute was with respect to the 5-percent bondholders’ claim that they were entitled to be subrogated to any securities to be allocated to Soo for an unsecured claim of $1,975,000 for interest on their bonds in excess of 4 percent up to the effective date of the plan, in accordance with paragraph 8 of the May 12,1952, Stipulation and Agreement (finding 53, supra).
Under the District Court’s order of April 17, 1953, all of the 23,850 shares of new Wisconsin Central common stock *297 allotted under tbe plan to Soo were held in escrow pending the outcome of this dispute. This dispute, in litigation for many years, was settled by compromise in 1960. In March 1960 the parties stipulated that of the 23,850 new common shares held in escrow, 9,000 shares were to go to Soo for its unsecured claims, and of the remaining 14,850, 5,800 were to go to the 5-percent bondholders on their unsecured claim and 9,050 shares were to go to Soo for its claim for the interest paid as guarantor. Under this final compromise agreement, Soo’s recovery was limited to 18,050 shares of new Wisconsin Central common stock.
56. Soo and its majority controlling stockholder, The Canadian Pacific Railroad, were also major bondholders and secured claimants entitled to other securities in the reorganization of Wisconsin Central. The Canadian Pacific had also bought large amounts of Wisconsin Central securities during the course of the reorganization proceedings. It owned $8,-400,000 of the $10 million principal value of Wisconsin Central 5-percent bonds, with respect to which there were also claims for $7,900,000 in interest secured by mortgage lien and $1,975,000 in interest which was unsecured. The Canadian Pacific was characterized by both the I.C.C. and the District Court as the “dominant claimant” in the Wisconsin Central reorganization.
57. The fair market value of the shares of new Wisconsin Central common stock to be received by Soo under the reorganization plan at the consummation of Wisconsin Central’s reorganization was $40 per share. Thus, as of 1952, the value of the maximum of 14,850 common shares issuable for the Soo’s $1,142,260 claim for interest payments it had made as guarantor was $594,000. And the value of the maximum of 9,000 shares attributable to the $6 to $7 million claim for advances and interest thereon, stipulated to be recognized to the extent of $750,000, was $360,000. The total maximum value was, therefore, $954,000 for the 23,850 shares. But since the bondholders who claimed the right to be subrogated to Soo’s recovery received 5,800 of the escrowed shares in the 1960 settlement for both claims asserted herein to be in the combined amount of $8,200,000, Soo actually *298 received 18,050 shares, which, at the 1952 value of $40 per share, totaled $722,000.
58. The LC.C.’s March 17, 1952, plan for the reorganization of Wisconsin Central, which was duly consummated March 1,1954, accorded no recognition to the holders of Wisconsin Central’s old preferred and common stock, and these stockholders in fact received nothing whatever for their holdings. The modified plan approved by the I.C.C. in this connection expressly provided that “the equities of the holders of the debtor’s preferred and common stocks have no value and nothing shall be distributed to them in the reorganization.”
59. On December 3, 1932, Soo, but for 95 shares, held all of Wisconsin Central’s preferred stock which had been acquired over the years in exchange for Soo’s own 4-percent Certificates. Pursuant to the consummation order at the time of Soo’s bankruptcy in 1944, the Wisconsin Central preferred stock was turned back by Soo to the holders of its 4-percent Certificates in exchange for such Certificates. Market trading in Wisconsin Central’s preferred stock commenced in 1940. Soo also held substantially all of Wisconsin Central’s common stock until 1944 when, pursuant to its own reorganization plan, Soo surrendered 56,420 shares of Wisconsin Central’s common stock which it had pledged. Trading in Wisconsin Central’s common stock commenced in 1947.
60. The volume of trading in Soo’s 4-percent Certificates, and the high and low prices quoted therefor on the New York Stock Exchange, are set forth in the table below for the years 1932-1939:
Amount traded, shares High Period
14.50 2.50 1933.
10,340 7.50 1.50 1934_
11,650 4.50 1.25 1935_
30,100 6.50 2.81 1936.
14,990 6.25 .88 1937.
12,480 1.75 .25 1938.
1,690 1.00 .25 1939_
91,282 Total..
*299 There is no evidence of any trading in the 4-percent Certificates between 1940 and 1944.
61.Over-the-counter high and low bid and asked prices for Wisconsin Central’s old preferred stock for the period 1940 to March 1,1954, the consummation date of Wisconsin Central’s reorganization plan, were as follows:
Wisconsin Central’s old preferred stock
1940.
1941.
1942.
1943.
1944.
1945.
1946.
1947_
1948.
1949 — .
1950.
1951.
1952.
1953.
1954 (2 months)..
62.Over-the-counter high and low bid and asked prices for Wisconsin Central’s old common stock for the period 1947 — March 1, 1954, were as follows:
Wisconsin Central’s old common stock
1947-.
1948-.
1949_.
1950.
7 U 1951-.
3H 1952-.
ZV¿ 1953.
m 1954 (2 months) -
There is no evidence of bid or asked prices for Wisconsin Central’s old common stock for the period from 1944 to 1947.
63.Soo was required to open new books of account as of September 1, 1944. All journal entries covering the necessary accounting adjustments had to be submitted to the I.C.C. *300 for approval. Soo placed a book value of $1 upon its unsecured claims against Wisconsin Central, and ascribed a like value to its secured claim against Wisconsin Central for interest paid as guarantor of Wisconsin Central’s 4-percent refunding bonds. Soo likewise placed a nominal $1 book value upon a number of other assets received from its predecessor upon its September 1,1944, reorganization under Section 77 of the Bankruptcy Act, the actual values of which assets were then uncertain or contingent, upon which Soo later made substantial recoveries. This accounting treatment had no effect upon Soo’s Federal income tax basis for its claims against Wisconsin Central. Soo, in its Federal income tax return for the period ending December 31, 1944, did not claim, and was not allowed, any deduction with respect to its claims against or stock holdings in Wisconsin Central, nor has Soo ever been allowed any Federal income tax deduction by reason of its claims against or stock holdings in Wisconsin Central.
64. Soo timely filed its Federal income tax returns for each of its tax calendar years 1950-1955, inclusive, with the United States Collector of Internal Revenue at St. Paul, Minnesota, or the United States District Director of Internal Revenue at St. Paul, Minnesota, and paid income taxes for the said years as follows:
(a) For the year 1950, Soo paid into the Treasury of the United States a total of $1,215,222.84 of income taxes as follows:

Date of payment: of payment

March 15, 1951_ $465,000.00
June 15, 1951_ 465, 000. 00
September 14, 1951_ 170,702.14
December 15, 1951_ 114,520.70
Total_ 1,215,222.84
Of this total sum, $11,180.10 was refunded to Soo on January 16, 1958, leaving an unrefunded balance of $1,204,042.74.
(b) For the year 1951, Soo paid into the Treasury of the United States a total of $1,164,543.18 of income taxes as follows:

*301
Date of payment: Amount of payment

March 14, 1952_ $425, 000. 00
June 13, 1952_ 425, 000. 00
September 15, 1952_ 139,861.70
December 15, 1952_ 174, 681.48
Total_ 1,164, 543.18
Of this sum, $13,599.26 was refunded to Soo on January 16, 1958, leaving an unrefunded balance of $1,150,943.92.
(c) Soo for its tax calendar year 1952 paid into the Treasury of the United States on December 31, 1957, a total of $680,026.16 of income taxes, plus $195,596.01 in deficiency interest thereon, and none of such sums has ever been refunded to Soo.
(d) For the year 1953, Soo paid into the Treasury of the United States nothing in income taxes by reason of having realized a net operating loss for that year in the amount of $680,982.43 (without regard to $3,391.09 of pre-1913 depreciation accrued on retirement method property retired in 1953 by Soo), none of which amount has ever been allowed to Soo either as a carryback or as a carryover.
(e) For the year 1954, Soo on January 24,1958, paid into the Treasury of the United States a total of $689,602.70 of income taxes plus $118,252.58 in deficiency interest thereon, none of which sums has ever been repaid to Soo.
(f) For the year 1955, Soo paid into the Treasury of the United States a total of $1,917,560.15 of income taxes, plus $173,733.52 in deficiency interest thereon as follows:
Date of payment Deficiency interest
December 14,1955.. $48,653.00
March 15, 1956_ 239,018.00
June 15, 1956. 239,018.00
January 24,1958. — . 1,558,436.77 $173,733.52
Total.. 2,085,126.77 173,733.52
Of the foregoing $2,085,125.77 in tax installment payments, $167,565.62 was applied by Soo as a credit against its 1956 Federal income tax liability. Thus, for Soo’s 1955 calendar tax year, $1,917,560.15 in tax and $173,733.52 in deficiency interest remain unrefunded.
*302 65. Soo filed a timely election to avail itself of the benefits of Section 94 of the Technical Amendments Act of 1958, Public Law 85-866. In consequence, the issues in this case relating to the validity of the Commissioner’s “terms letter” and its 30-percent reserve requirement have now been decided in defendant’s favor. The issues contained in paragraph 5(a) and paragraph 5(b) of the petition in this suit have been conceded to defendant by plaintiff.
66. In each of its tax calendar years 1950-1955, inclusive, Soo retired from service certain of its roadway property properly subject to depreciation under the retirement method of accounting. Upon the audit of Soo’s tax returns for those years, the Commissioner disallowed a portion of Soo’s tax basis of this retired roadway property equal to the depreciation such property has undergone prior to March 1,1913, the amounts being as follows:
Amount of deduction, disallowed by reason of „ , the property’s depre-Year of retirement: elation as of s/i/is
1950_|4,134.21
1951_ 5,182.48
1952_ 19, 494.90
1953_ 3, 391. 09
1954_ 3, 998.06
1955_11,181.92
Total_ 47,382. 66
67. The issues contained in paragraph 5 (c) of the petition in this suit have been conceded to plaintiff by defendant.
68. For the year 1953 Soo paid into the Treasury of the United States nothing in income taxes by reason of having realized a net operating loss for that year in the amount of $680,982.43 (without regard to $3,391.09 of pre-1913 depreciation accrued on retirement method property retired in 1953 by Soo), none of which amount has even been allowed to Soo either as a carryback or as a carryover.
69. Within the time provided by law, Soo filed formal refund claims for the years 1950, 1951, 1952, 1954, and 1955. The Commissioner formally disallowed all of these claims by statutory notice dated June 27, 1958. Soo’s refund claims claimed—
*303 (a) extra depreciation deductions for the years 1950-1955, inclusive, on the retirement of its retirement method roadway property in the amounts set forth above (finding 66) on the ground that no adjustment of its deductions was proper on account of pre-1913 depreciation;
(b) a deduction in 1952, and alternatively in 1954, on account of its advances made to Wisconsin Central prior to December 3, 1932, having first become wholly worthless in 1952 or 1954;
(c) a deduction in 1952 and alternatively in 1954, on account of its secured claims against Wisconsin Central represented by bond interest coupons having first become wholly or partially worthless in 1952 or 1954;
(d) an ordinary deduction and alternatively a capital loss deduction in 1952 and alternatively in 1954 on account of its holding of Wisconsin Central old common stock having first become wholly worthless in 1952 or 1954;
(e) appropriate carrybacks or carryovers of net operating losses and capital loss carryovers depending on which year or years its advances, secured claims, and stock investments first became wholly worthless.
70. This is an income tax case arising under Chapter 1 of the 1939 Code and Subtitle A of the 1954 Code of which this court has jurisdiction. This suit was timely brought.
■71. Plaintiff is the sole owner of the claims here sued upon and no assignment- or transfer thereof, or any- part thereof, or interest therein, has been made by plaintiff.
72. The parties hereto have agreed that the trial may be limited to issues relating to plaintiff’s right to recover, with the amount of any such recovery being left for determination at a later date under Rule 38 (c).
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect on its claim for refund on account of its secured claim against Wisconsin Central which became worthless in 1952. Soo’s claims for refund on account of its *304 unsecured claim and stockholdings in Wisconsin Central, which allegedly became worthless in 1952, are dismissed.
This case is remanded to the trial commissioner for computation of the amount due, together with interest as provided by law, under Eule 38(c), with respect to (1) Soo’s claim for a deduction from gross income on account of its secured claim becoming worthless in 1952; (2) Soo’s claim for extra depreciation; (3) Soo’s claim for a proper carry-back and carryover for losses sustained by Soo in 1953; (4) Soo’s claim for appropriate carry-back and carry-over of net operating losses which might result on account of its secured claim becoming worthless in 1952.
In accordance with the opinion of the court, a memorandum report of the commissioner, and a stipulation of the parties, it was ordered on April 22, 1964, that judgment be entered for the plaintiff for $945,283.38, together with interest thereon as provided by law.

 Section 23 of the Internal Revenue Code of 1939, as amended by sections 121, 123(a), 124 of the Revenue Act of 1942, 56 Stat. 798, and by sections 112(a), 113 of the Revenue Act of 1943, 58 Stat. 21, provides In pertinent part, as follows:
“§23. Deductions From Gross Income. — In computing net income there shall be allowed as deductions:
* * * * *
“(f) Losses by Corporations. — In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.
"(g) Capital Losses.—
*****
"(2) Securities hemming worthless. — If any securities * * * become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets.
*****
“ (k) Sad Debts.—
“(1) General rule. — Debts which become worthless within the taxable year; * *

 The balance of the Wisconsin Central common stock, i.e., 56,420 shares, pledged as collateral for Soo’s Gold Notes, was surrendered to the holders of the unpaid Gold Notes In 1944 during the course of Soo’s reorganization under section 77 of the Bankruptcy Act.

 On January 1, 1S30, Wisconsin Central sold to Soo $10 million maturity value of Wisconsin CentpaJ'S fipst and refunding five percent mortgage bonds for $8 pillion.

 This was done pursuant to an Order by the receivership court requiring the filing of claims other than those secured by mortgage which had arisen against Wisconsin Central prior to December 2, 1932.

 The filing time within which Wisconsin Central’s secured creditors was extended without limitation by the District Court. In fact, no secured claims were ever filed in Wisconsin Central’s receivership proceeding which was superseded by a section 77 trusteeship on September 30, 1944.

 There appears to be an inconsistency in the Stipulation of Eaets entered by the parties with respect to the exact amount paid by Soo as guarantor. At this stage of the proceedings we are not concerned with the exact amount, since the amount of recovery, if any, will be determined under Rule 38(c) of the Rules of this Court.

 Before the 1942 amendment, section 23(k) of the Internal'Revenue Code of 1939 allowed a deduction for “debts ascertained to be worthless and charged off within the taxable year * * Thus there were two requirements: (1) taxpayer had to reasonably determine that the debt had become worthless; (2) the mechanical writeoff of the debt, under section 124(a) of the Revenue Act of 1942, 56 Stat. 798, 820, a deduction from gross income is allowed for “[d]ebts which become worthless within the taxable year * *

 In 1952 Soo received 14,850 shares of new Wisconsin Central common stock worth $594,000, which amount was reduced when It entered into a settlement agreement In 1960 with bondholders who claimed to be subrogated to Soo’s rights as a secured creditor.

A special trial was conducted on the issue of the admissibility of one of these exhibits, being a memorandum dated August 26, 1946, of plaintiff to the Commissioner of Internal Revenue relating to the deductibility of certain losses sustained by plaintiff. At the special trial it was plaintiff’s contention that the exhibit was not admissible in evidence “because it was furnished to defendant by plaintiff’s counsel in furtherance of plaintiff’s settlement offer and under defendant’s express and explicit promise, which served to induce plaintiff to furnish it to defendant, that it would be returned without fail to plaintiff’s counsel at the conclusion of the settlement negotiations.” The evidence at the special trial established, however, that the furnishing of the exhibit to defendant by plaintiff’s counsel was not restricted to use in settlement negotiations and that, simultaneously with the settlement negotiations, the parties were working on a stipulation of facts to which the exhibit was relevant; and that the exhibit was referred to by another exhibit which was incorporated by the parties in the stipulation of facts.

 Whitman v. Webster, 122 F. 2d 860 (C.A. 8th).

 In re Wisconsin Central Railway Co., 03 F. Supp. 151 (D.C. Minn. 1,945).

 In re Wisconsin Central Railway Co., 64 F. Supp. 251 (D.C. Minn. 1946).

 The I.C.C. examiner’s proposed report on Wisconsin Central’s reorganization, as subsequently adopted by tbe I.C.C., was superseded at a later date due to tbe improved financial condition of the debtor. (See finding 48, infra.)

 This I.C.C. report was subsequently superseded due to the improved financial condition of the debtor. (See finding 48, infra.)

 This I.C.C. report was subsequently superseded due to the Improved financial condition of the debtor. (See finding 48, infra.)

 The basic valuation of the debtor's property as of June 30, 191-7, under section 19a of the Interstat6e Commerce Act, is reported in Valuation Docket No. 370, Minneapolis, St.P., & S.S.M. Ry. Co., 143 I.C.C. 547.

 Cost of reproduction new figures are based on prices prevailing in 1943 and during a period of time prior and subsequent thereto.

 In re Wisconsin Central Ry. Co.s 112 F. Supp. 916.

 Wisconsin Central Ry. Co. v. Zelle. 210 F. 2d 113.

 Wisconsin, Central Ry. Co. v. Zelle, 201 F. 2d 671.

 re Wisconsin Central Ry. Oo„ 113 e, Supp. 910, ut 919, 935-36.